**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NANO-X SECURITIES LITIGATION | No. 21-cv- 05517-RPK-PK<br><br>Date of Service:  August 25, 2022 |

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ................................................................................ 1

II. FACTUAL BACKGROUND ................................................................................... 3

    A. The Company Represents That Its Nanox.ARC Could Replace Legacy CT Devices By Reducing The Complexity Of The Machine And Its Cost ................. 3

    B. The Company Files Its IPO And The SEC Questions Its Cost Claims ................. 3

    C. Nanox.CART Is The "Single Source" And The First Version Of The Nanox.ARC Introduced By The Company ................................................................................. 4

    D. The Purported Functionalities Of The Multi-Source Nanox.ARC And The Capabilities Of CT Scanners Are Not The Same ................................................... 4

    E. Nano-X Misrepresented The Cost Of Purchasing And Assembling All The Components For Manufacture Of The Nanox.ARC ............................................... 5

    F. Defendants Issued False And Misleading Statements During The Class Period.... 6

    G. Disclosure Of The Fraud Caused Nano-X Stock To Fall, Damaging Investors ..... 7

III. STANDARD ON MOTION TO DISMISS ........................................................... 7

IV. ARGUMENT:  THE AC ADEQUATELY ALLEGES ACTIONABLE STATEMENTS ........................................................................................................ 8

    A. Defendants Issued False Statements Regarding The Cost Of Assembling The Nanox.ARC ........................................................................................................... 9

    B. Defendants Issued False and Misleading Statements And Omissions Regarding The Functionalities Of The Nanox.ARC ............................................ 10

    C. The False and Misleading Statements And Omissions Are Not Protected By The PSLRA Safe Harbor Nor The Bespeaks Caution Doctrine ..................... 14

    D. The False And Misleading Statements Are Actionable Opinions ....................... 17

    E. Plaintiff Pleads A Violation Of Regulation S-K .................................................. 18

V. ARGUMENT:  THE AC ADEQUATELLY ALLEGES SCIENTER ............................. 19

VI. ARGUMENT:  THE AC ADEQUATELY ALLEGES LOSS CAUSATION ................. 23

i

VII.   ARGUMENT:  THE AC ADEQUATELY ALLEGES CONTROL PERSON LIABILITY ................................................................................................... 25

VIII.   CONCLUSION ....................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) ......................................................................19

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)......................................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................8, 13

*Bos. Ret. Sys. v. Alexion Pharm., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)......................................................................24

*Catalano v. BMW of N. Am., LLC*,
167 F. Supp. 3d 540 (S.D.N.Y. 2016).......................................................................21

*City of Livonia Empls. Ret. Sys. v. Wyeth*,
2010 U.S. Dist. LEXIS 107729 (S.D.N.Y. Sept. 29, 2010)......................................22

*City of Providence v. Aeropostale, Inc.*,
2013 U.S. Dist. LEXIS 44948 (S.D.N.Y. Mar. 25, 2013) ..................................14, 15

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020)......................................................................15

*Cohen v. Koenig*,
25 F.3d 1168 (2d Cir.1994).......................................................................................16

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................................................23

*Fogarazzo v. Lehman Bros., Inc.*,
341 F.Supp.2d 274 (S.D.N.Y. 2004).........................................................................24

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................11, 12, 23

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000).....................................................................................19

*Gauquie v. Albany Molecular Resch., Inc.*,
   2016 U.S. Dist. LEXIS 97295 (E.D.N.Y. July 26, 2016) ......................................................22

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
   2013 U.S. Dist. LEXIS 43774 (S.D.N.Y. Mar. 27, 2013) .....................................................23

*In re All. Pharm. Corp. Sec. Litig.*,
   279 F. Supp. 2d 171 (S.D.N.Y. 2003)...................................................................................16

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
   741 F. Supp. 2d 511 (S.D.N.Y. 2010)...................................................................................23

*In re Atlas Air Worldwide Holdings Inc. Sec. Litig*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004)..............................................................................20, 22

*In re Barrick Gold Corp. Sec. Litig.*,
   341 F. Supp. 3d 358 (S.D.N.Y. 2018)...................................................................................15

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002)..................................................................................................22

*In re Complete Mgmt. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001)...................................................................................21

*In re Gen. Elec. Co. Sec. Litig.*,
   857 F. Supp. 2d 367 (S.D.N.Y. 2012)...................................................................................16

*In re Glob. Brokerage, Inc.*,
   2019 U.S. Dist. LEXIS 54506 (S.D.N.Y. Mar. 28, 2019) ......................................................8

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 U.S Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) ......................................................21

*In re Initial Pub. Offering Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008)...................................................................................23

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017).....................................................................................9

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277, 304-05 (S.D.N.Y. 2013) .....................................................................16

*In re Nokia Corp. Sec. Litig.*,
   2021 U.S. Dist. LEXIS 59824 (S.D.N.Y. Mar. 29, 2021) .....................................................15

*In re Nortel Networks Corp. Sec. Litig.*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003).....................................................................................8

iv

*In re Puda Coal Sec. Inc.*,
    2017 U.S. Dist. LEXIS 2122 (S.D.N.Y. Jan. 6, 2017)...........................................................25

*In re Regeneron Pharm. Inc. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 1350 (S.D.N.Y. Feb. 1, 2005)..........................................................14

*In re Salix Pharm., Ltd.*,
    2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22, 2016).......................................................15

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 233 (2d Cir. 2016)..................................................................................................14

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020)....................................................................................14

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
    2022 WL 3591140 (10th Cir. Aug. 23, 2022).........................................................................18

*Jefferson Ins. Co. v. Rouhana (In re Winstar Communs.)*,
    2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 24, 2006).....................................................24, 25

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    2016 U.S. Dist. LEXIS 96499 (D.S.C. July 25, 2016) ...........................................................22

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)..................................................................................................23

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015).....................................................................................21

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)..................................................................................................20

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
    716 F.3d 229 (1st Cir. 2013)..................................................................................................25

*Matrixx Initiatives, Inc. v Siracusano*,
    563 U.S. 27 (2011)..................................................................................................................8

*McKenna v. SMART Techs. Inc.*,
    2012 U.S. Dist. LEXIS 47134 (S.D.N.Y. Apr. 3, 2012).........................................................11

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)....................................................................................................8

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..............................................................................................19, 21

v

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
  575 U.S. 175 (2015).................................................................................11, 17

*P. Stolz Family Partnership L.P. v. Daum,*
  355 F.3d 92 (2d Cir. 2004)...............................................................................14

*Panther Partners Inc. v. Ikanos Commu'ns. Inc.,*
  681 F.3d 114 (2d Cir. 2012).............................................................................18

*Perez v. Higher One Holdings, Inc.,*
  2017 U.S. Dist. LEXIS 156175 (D. Conn. Sep. 25, 2017) ................................13

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.,*
  89 F. Supp. 3d 602 (S.D.N.Y. 2015)...............................................................24

*Rombach v. Chang,*
  355 F.3d 164 (2d Cir. 2004).............................................................................16

*Sgalambo v. McKenzie,*
  739 F. Supp. 2d 453 (S.D.N.Y. 2010).............................................................16

*Silsby v. Icahn,*
  17 F. Supp. 3d 348 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn,* 616 F.
  App'x 448 (2d Cir. 2015)...................................................................................4

*Slayton v. Am. Express Co.,*
  604 F.3d 758 (2010) .........................................................................................16

*Slomnitsky v. Caldwell (In re Allied Nev. Gold Corp. Sec. Litig.),*
  743 F. App'x 887 (9th Cir. 2018) .....................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007)..........................................................................................19

*Zola v. TD Ameritrade, Inc.,*
  172 F. Supp. 3d 1055 (D. Neb. 2016)...............................................................22

**Statutes**

15 U.S.C §77o...................................................................................................25

15 U.S.C. §78j(b)......................................................................................1, 8, 25

15 U.S.C. §78t(a) .................................................................................................1

15 U.S.C. §78u-4 ..........................................................................................14, 21

**Rules and Regulations**

17 C.F.R. § 229.303(ii) ..................................................................................................18

17 C.F.R. §240.10b-5....................................................................................1, 8, 25

17 C.F.R. § 240.12b-2...................................................................................................25

Fed. R. Civ. P. 8(a)(2)..................................................................................................23

Fed. R. Civ. P. 12(b)(6)..................................................................................................7

Fed. R. Civ. P. 15(a)(2)................................................................................................26

## I.    PRELIMINARY STATEMENT

This is a federal securities class action on behalf of purchasers of Nano-X Imaging ("Nano-X" or the "Company") securities from August 21, 2020 through November 18, 2021 inclusive (the "Class Period"), asserting violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Defendants are Nano-X, Ran Poliakine ("Poliakine") former CEO, and Itzhak Maayan ("Maayan") former CFO.

During the Class Period, Defendants represented that the multi-source Nanox.ARC, yet to be approved by the FDA, could be manufactured at the relatively low cost of $8,000 to $12,000 per unit, and that it could perform the same functionalities and achieve the same high-quality imaging as scanners that perform Computed Tomography ("CT"), i.e. tomography.  None of these representations were true.  On November 17 and 18, 2021, when an SEC subpoena and an Oppenheimer Report, respectively, revealed to the market the falsity of Defendants' statements, Nano-X's stock price dropped 7.96% and 5%, causing significant damages to investors.

Defendants Motion to Dismiss ("Defs.' Mot.") should be denied.  *First,* Plaintiff adequately alleges material misrepresentations and omissions.  All the component parts necessary to assemble the Nanox.ARC add up to *at least* $40,000 to $50,000, making Defendants' claims to be able to manufacture the product at such a low-cost categorically false, even if they are able to manufacture their purported Nano-X tube at the low cost represented.  *Second*, and as Defendants readily admit, the Nanox.ARC cannot produce the same quality of imaging as a CT scanner and can only perform a much lower quality of X-ray imaging, known as tomosynthesis.  The reference to tomosynthesis set forth in the first page of the IPO, cited by Defendants, is to the initial "single source" version of the Nanox.ARC (marketed as the Nanox.CART), whose functions were much more limited.  While the Company consistently represented that its device could perform functions comparable to the CT scanner, it failed to disclose that the images generated by the Nanox.ARC

1

were significantly lower in quality, and thus lacked the same diagnostic precision provided by CT the scanner. There should be no dispute that the investors, and the SEC, were led to believe that the Company was planning to market a more sophisticated device. Therefore, Defendants made materially misleading statements when they represented that they could deploy the Nanox System "at a substantially lower cost than currently available medical imaging systems, *such as computer tomography*" and issued statements favorably comparing the two devices, without disclosing that the Nanox.ARC, could *not* perform the same functions as the CT scanner. These misstatements were material to investors because *even if* the Nanox.ARC can be manufactured at a substantially lower cost than CT scanners (and Plaintiff does not dispute this), it would be material to investors to know that it was not at all comparable to the CT scanner.

*Second,* Plaintiff has adequately alleged scienter. *First,* Defendants had no basis to state that the Nanox.ARC can be manufactured at the range of $8,000 to $12,0000. The component parts of the device add up to at least *four to five times* that much. And, while Defendants argue that the cost estimate presumed "mass production" of the Nanox.ARC, this referred only to mass production of their Nano-X tube (meant to replace the legacy X-ray tube found in the CT scanner)—*not* to all the other more expensive parts of the device. The purported low cost of the Nano-X tube ($100 per tube and not disputed by Plaintiff) accounts for, approximately, only 0.25% of the entire device. *Second*, the Nanox.ARC cannot produce the same quality of imaging as the CT scanner and Defendants readily admit this.

*Third,* Plaintiff has adequately alleged loss causation. The SEC subpoena and the Oppenheimer Report, revealed to the market that the Nanox.ARC could not be manufactured at the stated cost, nor could it perform the same functionalities as the CT scanner. These disclosures

triggered declines in Nano-X's stock price and Defendants do not posit any other explanation for the declines. For these reasons, and others discussed below, Defendants' motion should be denied.

## II.   FACTUAL BACKGROUND

### A.   The Company Represents That Its Nanox.ARC Could Replace Legacy CT Devices By Reducing The Complexity Of The Machine And Its Cost

Nano-X is a company purportedly developing a new medical imaging system, which Nano-X refers to as its "Nanox System." The Nanox System has two integrated components—a hardware component called the "Nanox.ARC," and a software component called the "Nanox.CLOUD." Amended Complaint ("AC"), ECF No. 24 at ¶ 21 (hereinafter cited as "¶_"). The Company represents to have developed an X-ray source that "*could reduce the complexity and cost of the Nanox.ARC compared to legacy CT devices*"[1] and that it "believes that by using our X-ray source we will be able to significantly reduce the size of X-ray tubes and simplify the structure of our medical imaging system." ¶¶ 26, 29. The Nanox.ARC has two versions—a single-source (hereinafter the Nanox.CART) comprised of one X-ray tube and used for imaging of hands, wrists and feet and a multi-source, the Nanox.ARC, comprised of five X-ray tubes and purported to be used for whole-body scans. To date, the FDA has only approved the Nanox.CART in 2021. ¶ 31.

### B.   The Company Files Its IPO And The SEC Questions Its Cost Claims

On December 31, 2019, the SEC filed a letter addressed to Defendant Poliakine, asking the Company to discuss the basis for the statement [in the IPO Registration] "that you will be able to *market and deploy* the Nanox System broadly across the globe '*at a substantially lower cost* compared to currently available medical imaging systems, such as computed tomography." ¶ 34. In February 18, 2020, the Company filed a revised Draft Registration Statement stating that their X-ray source "will *allow the Nanox.Arc to have a more simplified structure without the costly*

---

[1] Emphasis is added in quotations, and citations are omitted herein, without further indication.

*cooling equipment or the complex rotating mechanism used in legacy CT devices*;" that they believe their X-ray source "*can achieve the same functionalities as legacy X-ray analog cathodes, while allowing for lower-cost production than existing medical imaging systems;*" and "[w]e *currently* estimate the aggregate cost of purchasing and assembling the components of the Nanox.Arc *will be approximately $8,000 to $12,000 per unit . . ."* ¶¶ 35-36.

**C.     Nanox.CART Is The "Single Source" And The First Version Of The Nanox.ARC Introduced By The Company**

In its IPO Registration Statement the Company states, "the *first* version of the Nanox.ARC that we expect to introduce to the market will be a three-dimensional ("3D") tomosynthesis imaging system, (Defs.' Ex.[2] 1 at 1) "we expect to take a multi-step approach to the regulatory clearance process.  As a first step, we submitted a 510(k) application for a single-source version of the Nanox.ARC . . ." *Id.*  On April 2, 2021 the Company announced that it had received 510(k) clearance from the FDA for Nanox.CART, (Ex. 1[3] (April 2, 2021 Press Release) at 1) stating, "Obtaining 510(k) [] for our single-source Nanox.ARC digital x-ray is a significant step forward along our US regulatory pathway." *Id.*

**D.     The Purported Functionalities Of The Multi-Source Nanox.ARC And The Capabilities Of CT Scanners Are Not The Same**

Defendants now readily admit that the Nanox.ARC *does not* have the same functionalities as CT scanners.  Defs.' Mot. at 6.  ("Defendants have never stated that the Nanox.ARC will perform the same imaging as a CT scanner.").  The high-resolution and 3D reconstruction available from the CT scanner results from the use of tomography.  It is achieved by rotation of the X-ray

---

[2] "Defs.' Ex. ___" refers to the exhibits to the Christopher P. Malloy Declaration in Support of Defendants' Motion to Dismiss the AC, served on the Lead Plaintiff on July 25, 2022.

[3] "Ex. ___" refers to exhibits to the Veronica V. Montenegro Declaration in Support of Lead Plaintiff's Opposition to Defendants' Motion to Dismiss. "The Court can take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC") and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law." *Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014), *aff'd sub nom. Lucas v. Icahn,* 616 F. App'x 448 (2d Cir. 2015).

source and "camera" or "detector" around the patient's body, taking hundreds to thousands of images in a number of seconds, which are then used to reconstruct the scanned object or person, using "slices" or other 3D visualizations. ¶ 50. On the other hand, the Nanox.ARC purports to use a small number of angles which would result in information-poor images, either having low resolution and/or limited depth of field, known as tomosynthesis. *Id.* Thus, tomography has far greater diagnostic capacity than tomosynthesis. Devices using the different technologies and producing differing results are neither functionally equivalent nor competitively comparable. Despite now admitting that the Nanox.ARC cannot replace the CT scanner, Defendants still maintain that their "Nano-X "tube" can be mass produced at $100 per tube/unit and that it *can* replace the legacy X-ray tube (or "legacy tube"),[4] which costs approximately $150,000. ¶¶ 28, 51. However, such is not the case because the capabilities of the legacy tube and the Nano-X tube are vastly different: the Nano-X tube produces 1,000 times less X-ray intensity (making a CT-quality scan impossible, even if the Nano-X tubes were to be used in a CT scanner). *Id.*

**E.      Nano-X Misrepresented The Cost Of Purchasing And Assembling All The Components For Manufacture Of The Nanox.ARC**

During the Class Period, Defendants represented that they currently estimate that the cost of purchasing and assembling the components of the Nanox.Arc will be approximately $8,000 to $12,0000 (*see, e.g.,* ¶ 54), other times $10,000 (*see, e.g.,* ¶ 70). Defendants attributed the lower cost of the Nanox.ARC to the fact that Nano-X purports to be able to manufacture the Nano-X tube for $100 versus the $150,000 cost for the legacy tube in the CT scanner. ¶ 55.[5] In other words, Defendants asserted that the key component of its device could be produced at less than

---

[4] The legacy X-ray tube used in existing CT scanners uses an analog cathode X-ray source, versus the digital microelectromechanical system ("MEMs") semiconductor cathode purported to be used in the Nanox.ARC. *See* ¶ 4.
[5] As Defendant Poliakine stated "[t]he cost associated with the source [] is dramatically less [] because it's mass-produced semiconductors that we estimate to be less than $100 in mass production versus $150,000 for average cost of a similar X-ray tube, and that's a big difference." ¶ 80.

5

1% of the same component in the CT scanner, and still perform the same quality level of imaging. Defendants were aware of the impact on the cost of the Nanox.ARC of other component parts.[6]

The price estimate is impossible when considering the different parts required by an X-ray system. ¶ 56. Nano-X purports to make a digital system which necessitates a high-quality digital detector, costing anywhere between $35,0000 to $70,000. ¶ 57. The Nanox.ARC would also need various other components (*see* ¶ 58), all of which would add *at least* another $20,000 to the cost. *Id.* While the Company attributed the "substantially lower cost" of assembling the Nanox.ARC to its "novel" cold cathode, in the Nano-X tube (¶¶ 59-60), none of the Company's patent applications, nor anything else, explains how the Nanox.ARC could be assembled for the lower-cost of $10,000, taking into consideration all parts needed for assembly. *Id.*

**F.    Defendants Issued False And Misleading Statements During The Class Period**

During the Class Period, in *at least thirteen* different sources, Defendants made materially false and misleading statements and omissions comparing the functionalities of the Nanox.ARC to the CT scanner, and claiming that the Company could manufacture the Nanox.ARC, a comparable product, for a fraction of the cost of the CT scanner. ¶¶ 65-96. For example:

- *[w]e believe* [x-ray source] *can achieve the same functionalities as legacy X-ray analog cathodes, while allowing for lower-cost production* than existing medical imaging systems. ¶¶ 66, 84.
- If cleared, *we plan to market and deploy the Nanox System globally at a substantially lower cost than currently available medical imaging systems, such as computed tomography ("CT"), . . . the Nanox.ARC to have a simpler structure without the costly cooling equipment* or the complex rotating mechanism used in legacy CT devices. . . . *Id.*
- We believe *our digital X-ray source technology will allow us to manufacture the Nanox.ARC, if cleared, at substantially lower costs* compared to medical imaging systems that use a legacy analog X-ray source *without sacrificing imaging quality. Id.*
- *We currently estimate the aggregate cost of purchasing and assembling the components of the Nanox.ARC will be approximately $8,000 to $12,000 per unit,* assuming at least 15,000 Nanox.ARC units will be manufactured. We believe this will enable us to offer the Nanox

---

[6] Defendant Poliakine stated, "[s]o overall, I think the other component, like the power supply detector, mechanics are much more impactful in terms of meeting the $10,000 goals over time . . .". ¶ 93.

System at a substantially lower cost than the cost of existing medical imaging systems based on analog X-ray sources. *For example, a new high-end CT scanner sells for $1,350,000 to $2,100,000 . . . Id.*

- We have a technology that actually *take generations forward the imaging capabilities and making this medical imaging affordable,* accessible and available.  And as you can see on the right side of the screen, this is a full-body scanner. *This full-body scanner is estimated to be $10,000 only, which is way below any other alternatives. . .* ¶ 68.

- The cost associated with the source itself because of the heat generated, et cetera, is dramatically less when you talk about Nanox technology simply because *it's mass-produced semiconductors that we estimate to be less than $100 in mass production versus $150,000 for average cost of a similar X-ray tube, and that's a big difference.* When you can make something costs $100 versus $150,000, you can change the world.  ¶¶ 80, 88.

- So, what is the Nanox.ARC? *The Nanox.ARC is the tomographic* and solid state of the ARC X-ray system which is *intended to capture tomographic slices* of the human body in one signal tomographic sweep . . ."[7]

**G.    Disclosure Of The Fraud Caused Nano-X Stock To Fall, Damaging Investors**

On November 17, 2021, the Company disclosed that it had received a subpoena from the SEC requesting documents and other information relating to the development costs of the Company's Nanox.ARC prototypes, as well as the Company's estimate for the cost of assembling the final Nanox.ARC product at scale.  ¶¶ 97-99.  On this news, the Company's stock price declined $1.73, or 7.96%.  *Id.*  On November 18, 2021, Oppenheimer issued a report disclosing receipt of the subpoena and providing a critique of the Company's claim that it could produce a $100 tube and a $10,000 system.  ¶ 100. On this news, the Company's stock price declined $1 or 5% (*id.*) and continued to decline the following day, resulting in a cumulative 18% decline.   To date, the Nanox.ARC has not been approved by the FDA.

### III.    STANDARD ON MOTION TO DISMISS

In ruling on a Rule 12(b)(6) motion, the Court must accept as true all well-pleaded factual

---

[7] *See* Ex. 2 (17th Annual Canaccord Genuity Musculoskeletal Conference) at 3,5. While the statement falls outside the Class Period, the statement—made by the current CFO—is relevant to a contextual understanding of Defendants' statements throughout the Class Period.

allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims.'" *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003). The AC need only contain enough facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009). There simply must be "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" corroborating the claims. *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v Siracusano*, 563 U.S. 27 (2011). "A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *Nortel*, 238 F. Supp. 2d at 621. "[T]he motion to dismiss for failure to state a claim is disfavored and is seldom granted." *Nortel,* 238 F. Supp. 2d at 621.

## IV.    ARGUMENT:  THE AC ADEQUATELY ALLEGES ACTIONABLE STATEMENTS

Under § 10(b) and Rule 10b-5 promulgated thereunder, a defendant is liable for both affirmative misstatements and material omissions. 15 U.S.C. §78j; 17 C.F.R. §240.10b-5. "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). "A statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue." *In re Glob. Brokerage, Inc.*, 2019 U.S. Dist. LEXIS 54506, at *28-29 (S.D.N.Y. Mar. 28, 2019). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Jinkosolar*, 761 F.3d at 250-51. It is usually improper for a court to resolve disputes concerning the false or misleading nature of a statement on a motion to dismiss, because "[s]uch a determination is generally a

8

question reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). "Thus, the matter must go to a jury unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that ***reasonable minds could not differ*** on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *Id.*

**A.      Defendants Issued False Statements Regarding The Cost Of Assembling The Nanox.ARC**

Defendants made materially false statements concerning the cost of the Nanox.ARC. Defendants represented that they "*currently* estimate[d]" the cost of the Nanox.ARC will be approximately $8,000 to $12,000, per unit (*see, e.g.,* ¶ 66) or $10,000. ¶ 70. This statement is categorically false. In the AC, Plaintiff alleges specific facts showing that the Nanox.ARC cannot be manufactured at such a low cost. ¶¶ 54-58; *see supra* 5-6. *Id.* Furthermore, nothing in Defendants' patent applications justifies the lower cost. ¶ 60.

Defendants argue that their statements concerning cost are not actionable. Defs.' Mot. at 8-10. *First*, Defendants argue that the cost of the detector used to manufacture the Nanox.CART (which costs $20,000; ¶ 57) says nothing about the one needed for the Nanox.ARC (Defs.' Mot. at 8), but the Nanox.CART, with its single tube, creates a lower quality resolution image than the Nanox.ARC. ¶ 49. Therefore, the Nanox.ARC would necessitate a detector *at least* as powerful as the one used in the much simpler Nanox.CART. *Next*, Defendants argue that the cost estimate is not false because they relate to cost of "mass production" and that the AC does not allege the estimated detector cost when sourced for a production run of 15,000 or more units. Defs.' Mot. at 8-9. However, the AC sufficiently describes the parts cost breakdown for the real approximate cost of assembling the Nanox.ARC (¶¶ 55-58) and explains why the detector needed for the Nanox.ARC would cost more than the one used in the Nanox.CART. ¶ 57. And, in any event,

9

Defendants attributed the lower cost of manufacturing the Nanox.ARC to the cost of *mass-manufacturing the Nano-X tube*—not the Company's ability to obtain detectors, and other components, at a lower price. *See, e.g., id.* ¶¶ 55, 68.

**B.    Defendants Issued False and Misleading Statements And Omissions Regarding The Functionalities Of The Nanox.ARC**

Defendants also made materially false and misleading statements and omissions concerning the functionalities of the Nanox.ARC. *First*, Defendants represented that they "believe [their X-ray source] *can achieve the same functionalities* as legacy X-ray analog cathodes," (¶¶ 66, 84) and that they believe the Nanox.ARC, would not "*sacrific[e] imaging quality*," (*id.*) and that they "have a technology that actually *take generations forward the imaging capabilities . . ."* ¶ 68. Even the SEC understood this to mean that the Nanox.ARC could perform "computed tomography." *See supra* 3-4. These statements are patently false. The Nanox.ARC, with the Company's X-ray source, cannot achieve the "same functionalities" nor "imaging capabilities" nor the same "imagine quality" as the CT scanner. Defendants do not deny this. Defs' Mot. at 6. *Second*, Defendants issued various statements comparing the two devices, which, without more, gave investors (and the SEC) the impression that the Nanox.ARC and the CT scanner were comparable and that the Nanox.ARC could perform the same functions as the CT scanner, at a fraction of the cost. These statements are materially misleading by omission. For example, Defendants said, "*we plan to market and deploy the Nanox System globally at a substantially lower cost . . .* because [X-ray source] *will allow the Nanox.ARC to have a simpler structure without the costly cooling equipment . . ."* ¶¶ 66-84. In investor presentations, Defendants included graphics of the devices and of the Nano-X and the legacy X-ray tubes, side by side, comparing their physical structure, size and cost—thereby misrepresenting to investors that the two devices (and respective tubes) could perform the same function. ¶¶ 72-76, 82-83. More recently, the current Nano-X CFO

10

told investors the Nanox.ARC performs tomography *(see supra* 7 n. 7).  If the current CFO believed (rightly or wrongly) that the Nanox.ARC was designed to perform tomography it is certainly reasonable to have drawn that same conclusion from the Company's prior statements.

In determining whether an omission makes a statement misleading, the Supreme Court has directed courts to examine the statement, whether of fact or opinion, "in light of all its surrounding text," "in its full context," and from the perspective of a "reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).  It is without question that a reasonable investor would have been left with the impression that that the two devices were comparable.  By making affirmative representations that the cost of the Nanox.ARC would be substantially less than available medical imaging, Defendants put this topic into "play" and triggered a duty to disclose all information necessary to render their statements not misleading. *See McKenna v. SMART Techs. Inc.*, 2012 U.S. Dist. LEXIS 47134, at *37 (S.D.N.Y. Apr. 3, 2012) (where defendant's statement "put [a] question . . . 'in play,'" defendant is "required to make full disclosures to ensure the accuracy of [its statements]").   Without more, investors were left with the false impression that the Nanox.ARC, manufactured at a substantially lower cost than a CT scanner, could perform the same functions as one and produce the same high-quality imaging in contrast to devices that performed only tomosynthesis.  This is simply not the case, as Defendants readily admit.  "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).  It defies reason that the Company would compare the cost of the two devices (¶¶ 66, 84) and state that the Nanox.ARC can significantly reduce the cost of medical imaging systems globally (*id.) unless it was doing it to bolster statements that the Nanox.ARC can perform the same functions as the CT scanner, but at a lower cost.*  Similarly, if, as Defendants admit, the

Nanox.ARC cannot achieve the same functionalities as the CT scanner, it makes no sense to tout the "simpler cooling structure" of the Nanox.ARC, or provide a detailed cost comparison, $8,000 to $10,000 versus $1.3M to $2.1M. ¶¶ 66, 84. Unless the Nanox.ARC *can* replace the CT scanner it is an apples to oranges comparison. In various occasions, Defendant Poliakine compares the Nano-X and legacy X-ray tubes, stating that the cost of the tube goes down from $15,000 to $100 (*see, e.g., ¶* 68). Again, if the Nano-X tube cannot replace the legacy X-ray tube, nor the image quality that it and the CT scanner can produce, (and it cannot) it is hard to imagine what else Defendant Poliakine could have meant when he said "when you can move from $150,000 to $100, you can change the world," (*id.)* other than to mislead investors into thinking that it *can.*

The cost and functionality misrepresentations and omissions are necessarily intertwined. Nano-X's success depends on convincing customers (and investors) that the Nanox.ARC can perform as well as the CT scanner, but at a significantly lower cost. Investors might be happy to invest in a product that *can* replace the CT scanner and costs $10,000 (as represented) or even more than that (i.e., $50,000). On the other hand, it would not matter to investors how much cheaper the Nanox.ARC is, if it fails to perform as represented.

Defendants cite two instances— the IPO Registration Statement and Nano-X's 4Q 2020 earnings call—where the Company described the Nanox.ARC as performing tomosynthesis. *First,* Defendants claim that because the Company's Registration Statements stated that the first product introduced to market would perform tomosynthesis and not tomography, investors could not have been misled. Defs.' Mot. at 12 n. 6. However, it is well-know that the Nanox.CART was the *first* product for which Nano-X filed for and obtained approval, as amply touted by the Company *(see supra* 4). The statement concerning the *first* version clearly stated that it performed tomosynthesis—the language in the IPO Registration Statement, stating that *the multiple-source*

Nanox.ARC would be the Company's "commercial imaging system" (Defs.' Mot. at 12 n. 6)—does not change that. Investors reasonably concluded from the holistic "context" of all these statements that the commercial version would perform tomography, like the current CFO stated. In ruling on a motion to dismiss, the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *Second*, they argue that as a result of those two instances investors could not have been misled into thinking that the Nanox.ARC could perform tomography. Defs.' Mot. 11-12. However, even the SEC raised questions concerning the Nanox.ARC's ability to achieve the same functionalities *as devices with legacy tubes* (tomography) (*see supra* 3-4) and, consistent with representations that the Nanox.ARC *can,* the current CFO stated that the Nanox.ARC *performs tomography*. *See supra* 7 & n. 7; *see also* ECF No. 31 at 2. Moreover, "[t]he central issue . . . is *not whether the particular statements, taken separately, were literally true*, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor . . . ." *Perez v. Higher One Holdings, Inc.,* 2017 U.S. Dist. LEXIS 156175, at *10 (D. Conn. Sep. 25, 2017). Here, given the *dozens* of references to comparability of functionalities between the two devices, in plain speak, an investor could reasonably conclude that the multi-source Nanox.ARC would perform tomography and/or produce images comparable to those generated by the CT scanner.

Defendants also baldly claim that their statements that their technology can achieve the same functionalities as the legacy X-ray were statements concerning "the promise" of the technology and not statements "regarding capability." Defs.' Mot. at 11 n. 5. This argument falls flat on its face as the remainder of the paragraph clearly states that the technology *is* developed and not "developing" or "expected to develop" in the future: "[W]e *developed* this technology

13

over eight years to reach commercial applicability."[8]  Defs.' Ex. 1 at 1.  Finally, Plaintiff does not argue that Nano-X had "a duty to disparage its system."  Defs.' Mot. at 13.  However, "[i]t is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information" on the issue or topic.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 233, 258 (2d Cir. 2016).  Once Nano-X decided to compare the Nanox.ARC to the CT scanner, it did have "a duty to tell the whole truth."

**C.     The False and Misleading Statements And Omissions Are Not Protected By The PSLRA Safe Harbor Nor The Bespeaks Caution Doctrine**

Defendants argue that certain alleged misrepresentations are protected by the safe harbor and the be speaks caution doctrine.  Defs.' Mot. at 14-15.  Neither the safe harbor nor the bespeaks caution doctrine, however, applies to statements of historical or current fact.  *See, e.g.*, *In re Regeneron Pharm. Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 1350, at *38-39 (S.D.N.Y. Feb. 1, 2005) ("Representations of historical or current fact do not qualify for the PSLRA's safe harbor."); *P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004) (limiting bespeaks caution doctrine to "forward-looking, prospective representations").  Moreover, this Circuit has held that "the PSLRA safe harbor does not protect material omissions."  *In re Weight Watchers Int'l Inc. Sec. Litig.,* 504 F. Supp. 3d 224, 253 n. 4 (S.D.N.Y. 2020).  This is true, "***regardless of whether the statements thereby rendered misleading were forward-looking***." *City of Providence v. Aeropostale, Inc.*, 2013 U.S. Dist. LEXIS 44948, at *32 (S.D.N.Y. Mar. 25, 2013).

The alleged misrepresentations here are based on Defendants' representations of current fact, such as statements that they *currently* have a technology that can achieve the same

---

[8] *See also* Ex. 3 (Jefferies Asia Forum) at 4 (Poliakine describing the current state of the technology:  "So as I said, we started this venture 8 years ago off the activities in Sony.  *We have developed in 8 years the source, the tube and the full system*.")

14

functionalities as the CT scanner (¶¶ 66, 84) that "can take generations forward imaging capabilities" (¶ 68) and that their *current* estimate is that they can assemble the Nanox.ARC for $8,000 to $12,000.  ¶¶ 66, 84.  Statements "we plan to market and deploy the Nanox System" (*id.*) or "we believe our digital technology will allow us to manufacture the Nanox.ARC, if cleared," "at substantially lower costs" (*id.*) are not forward looking because they describe Nano-X's *current ability* to manufacture the Nanox.ARC at a lower cost.  Similarly, statements such as, "we believe [our X-ray] can achieve the same functionalities as legacy X-ray analog cathodes," (*id.*) and "[w]e believe our digital X-ray source technology will allow us to manufacture the Nanox.ARC, if cleared, at substantially lower costs compared to medical imaging systems [] without sacrificing imaging quality," (*id.*) are statements of Nano-X's *current ability* to manufacture a device that has the same "functionalities" and "imag[] quality" as the CT scanner.  *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 135 (S.D.N.Y. 2020) (finding that statement that defendants "believe[d]" was not a forward-looking statement because it misrepresented present facts); *In re Salix Pharm., Ltd.,* 2016 U.S. Dist. LEXIS 54202, at *29-30 (S.D.N.Y. Apr. 22, 2016) (finding that statements regarding "expectation" of something transpiring not forward looking when "predicated upon representations [of] *current"* facts).[9]

Furthermore, even if the alleged misrepresentations are forward-looking statements, there are two additional reasons why they are still not protected.  *First,* the cautionary language identified by Defendants (Defs' Mot. at 5-6) is deficient because it warns of facts already known to Defendants—their inability to manufacture the Nanox.ARC at the stated cost.  "Cautionary

---

[9] Here, unlike in *In re Nokia Corp. Sec. Litig.*, 2021 U.S. Dist. LEXIS 59824, at *59 (S.D.N.Y. Mar. 29, 2021) and *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018), the alleged misrepresentations reflect Nano-X's statements about the Company's ability, *presently*, to manufacture the Nanox.ARC with the "same functionalities," at the cost range provided "if cleared" by the FDA— that was the only variable given. Therefore, the alleged misrepresentations are statements of present fact not protected by the safe harbor provision.

words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).[10]  "[W]arning of possible risks while failing to disclose critical facts [is like] someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *MF Glob.*, 982 F. Supp. 2d at 318.  *Second,* the safe harbor does not "protect[] a defendant from liability if a statement was knowingly false when made."  *In re All. Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 192 (S.D.N.Y. 2003).  In this context, actual knowledge of falsity does not mean knowledge that a projection is impossible to meet.  Rather, a forward-looking statement is made with actual knowledge of falsity if the speaker has actual knowledge that that there is no reasonable basis for the statement.  *See Slayton v. Am. Express Co*, 604 F.3d 758, 774 (2d Cir. 2010); *see also Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) ("[A] relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud.")*; In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 391 (S.D.N.Y. 2012) ("[U]nder *Slayton*, a forward-looking statement is made with actual knowledge of falsity if, *inter alia*, a company has actual knowledge of undisclosed facts tending to seriously undermine the accuracy of the projection."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, (S.D.N.Y. 2010) (finding statement that "we believe" while possibly forward-looking, was not protected by safe harbor when defendants had no basis for making the statement).  Here, the AC pleads sufficient facts giving rise to a strong inference that Defendants had no reasonable basis for their statements. *See infra* 18-22.  Finally, many of the alleged misrepresentations are alleged to be misleading for their **omission** of material facts (*see supra* 10-12) and are thus not protected by either doctrine.

---

[10] *See also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304-05 (S.D.N.Y. 2013) ("[c]autionary language that is misleading in light of historical fact cannot be meaningful"); *EVCI*, 469 F. Supp. 2d at 102 (similar).

**D.      The False And Misleading Statements Are Actionable Opinions**

Defendants incorrectly suggest that by qualifying certain of the alleged misrepresentations with words like "believe" or "think," Defendants are immune from liability.  Defs.' Mot. at 16-17.  "[A] reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Omnicare,* 575 U.S. at 188.  The Supreme Court, expressly rejected the argument that opinion phrases, such as "we believe" or "we think" categorically disqualified a statement from being actionable, stating "those magic words can preface nearly any conclusion and the resulting statements, as we have shown, remain perfectly capable of misleading investors." *Id.  Omnicare* now makes clear that "***opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable*** if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Id.* at 210.  Under *Omnicare,* an opinion statement must "fairly align[] with the information in the [speaker's] possession at the time.  *Id.* at 189.  Statements of opinion are actionably misleading, such as the alleged misrepresentations regarding the costs of manufacturing the Nanox.ARC and its false comparability to the CT scanner, where there are "particular (and material) facts going to the basis for the [] opinion [] ***the knowledge [they] did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable*** person reading the statement fairly and in context." *Slomnitsky v. Caldwell (In re Allied Nev. Gold Corp. Sec. Litig.)*, 743 F. App'x 887, 887-88 (9th Cir. 2018) (citing *Omnicare,* 135 S. Ct. at 1332-33.

Unlike Defendants' argument (Defs.' Mot. at 17) the AC is replete with allegations that Defendants *did* know that the cost range given for the Nanox.ARC was far higher and that the Nanox.ARC cannot achieve the same functionalities as the CT scanner (*see infra* 18-22; ¶¶ 105-141), as to the latter, Defendants have admitted it.  Moreover, the AC does state exactly what

17

"particular and material facts Defendants omitted to state which would render the challenged opinion statements misleading." Defs.' Mot. at 17. *See, e.g.,* ¶ 67 (failure to disclose: (i) the actual costs for assembling the Nanox.ARC was likely to be at least $40,000 to $50,000 pe unit, e.g., upwards of 4-5 times greater than represented; and (ii) the Nanox.ARC was not comparable to the existing CT imaging . . .").[11]

## E.     Plaintiff Pleads A Violation Of Regulation S-K

Pursuant to Items 303 and 505 of Regulation S-K, 17 C.F.R. § 229.303(ii), Defendants had an affirmative, independent duty to disclose "any *known trends or uncertainties . . .*" and the Company's "*most significant risk factors.*"   The Company's inability to manufacture the Nanox.ARC at the cost represented and incapable of achieving the same functionalities as the CT scanner, despite Defendants' statements to the contrary, *were known uncertainties and risk factors.* Defendants knew they could not manufacture the Nanox.ARC at the lower cost (*see infra* 18-22) and they have admitted that the Nanox.ARC does not have the same functionalities as the CT scanner.   Defendants' known inability to deliver the promised product would lead them to reasonably expect it to impact their ability to continue operations and to represent a significant risk factor. *See Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 2022 WL 3591140, at *24 (10th Cir. Aug. 23, 2022) (reversing dismissal of Item 303 claim due to failure to disclose "sales capacity gap" trend); *Panther Partners Inc. v. Ikanos Commu'ns. Inc.*, 681 F.3d 114 (2d Cir. 2012) (Item 303 disclosure required where chip defect issue and its potential impact on registrants' business was known and reasonably expected it would have a material unfavorable impact).

---

[11] In Section II. E. of Defs.' Mot., Defendants argue that certain alleged misrepresentations are non-actionable statements of puffery and expressions of corporate optimism. The falsity of those statements is at issue in separate matters (*White v. Nano-X Imaging Ltd.*, No. 1:20-cv-04355 (E.D.N.Y. compl. filed Sept. 16, 2020); *Duarte v. Nano-X Imaging Ltd.*, No. 1:20-cv-04528 (E.D.N.Y. compl. filed Sept. 24, 2020)), which are also subject of a consolidation motion Plaintiff has opposed. *See* ECF No. 32.

## V.    ARGUMENT:  THE AC ADEQUATELLY ALLEGES SCIENTER

In order to adequately plead scienter, a plaintiff must allege facts that, when viewed holistically, give rise to a "strong inference" that the defendants acted with "the required state of mind." *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007). In the Second Circuit, a plaintiff may satisfy this standard by pleading facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Recklessness can be shown by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Id.* at 311.

Scienter is adequately alleged if the facts, taken as true, give rise to an inference that Defendants intentionally or recklessly misled the public.  *Tellabs*, 551 U.S. at 324. "When the competing inferences rest in equipoise, the 'tie . . .goes to the plaintiff.'"  *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).  The proper inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S at 322-23, 326.  Scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.  Nor plead with "great specificity." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 169 (2d Cir. 2000).  The AC adequately pleads scienter.

*First,* Defendants had no basis to make statements stating that the Nanox.ARC had the same functionalities as the CT scanner, it did not (¶¶ 48-58, 105-110).  Defendants readily admit knowing this.  Moreover, a review of Nano-X's patents demonstrates that the Company did not have the technology to perform tomography.  ¶¶ 59-62.  Accordingly, if the Court finds that the alleged misrepresentations and omissions comparing the two devices are false and/or misleading, scienter here is met.  *Second*, Defendants had no basis to make the repeated current estimate of cost.  ¶¶ 54-58.  Furthermore, because the Nanox System is *the sole product* of the Company, and,

19

upon which, as admitted by Nano-X, the Company's success hinges, it is implausible that Defendants would not expressly know that the Nanox.ARC cannot be manufactured at the represented cost. ¶ 108. In the 1Q 2021 earnings call (¶ 93) Defendant Poliakine spoke of the other components of the Nanox.ARC (e.g. "power supply, detector") which further confirms that he was well-aware of the costs associated with other component parts. "[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

*Third*, the Company's correspondence with the SEC, concerning the SEC's questioning of the basis for Nano-X's claims regarding the low cost of the Nanox.ARC supports an inference of scienter. The SEC expressly asked the Company about its claims to be able to manufacture the Nanox.ARC at such a low cost. ¶¶ 111-114. The letter was addressed to Poliakine, making him aware of the SEC's inquiries and triggering a duty to investigate the veracity of the cost estimate. ¶ 112. After the SEC raised concerns, added disclosures were included in the IPO and the SPO Registration Statements (¶ 36), both signed by the Individual Defendants. Accordingly, in connection with responding to the SEC inquiry, Defendants became aware that the cost estimate was false. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015) (allegations demonstrating defendant's "awareness of undisclosed facts that rendered the company's representations to investors materially misleading" sufficient to plead scienter).

*Fourth*, the core operations doctrine supports an inference of scienter. ¶¶ 118-121. "When a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the ***core operations*** of the company supports the inference that the defendant knew or should have known the statements were false when made." *In re Atlas Air*

20

*Worldwide Holdings Inc. Sec. Litig*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004); *accord In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 U.S Dist. LEXIS 171110, at *71-74 (S.D.N.Y. Dec. 2, 2013) ("core operations doctrine" permits an inference that a company and its senior executives have knowledge of information concerning the "core operations" of a business); *see In re Complete Mgmt. Sec. Litig.,* 153 F. Supp. 2d 314, 325 (S.D.N.Y. 2001) (finding it "inconceivable" that officers were unaware of problems involving the company's largest client).  "Core operations" include matters "critical to the long-term viability" of the company and events affecting a "significant source of income." *In re Hi-Crush,* 2013 U.S. Dist. LEXIS 171110, at *73.  Here, it is undisputed that the Nanox System, as the Company's sole product, forms part of its core operations.  ¶¶ 118-120.  Thus, it is implausible that Defendants did not know that the cost estimate of the Nanox.ARC was false, when by virtue of their positions, they were required to have full knowledge of Nano-X's business relating to matters critical to the Company's long-term viability which would affect the Company's future source of income.  ¶ 121.[12]

*Fifth,* Defendants' failure to disclose information that they had a duty to disclose supports an inference of scienter.  *See supra* 18; ¶¶ 122-123.  Both conscious misbehavior and recklessness may be inferred when the duty to disclose is clear.  *See Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 560 n. 14 (S.D.N.Y. 2016) ("[I]n [*Novak*], the Second Circuit held that the plaintiffs adequately pleaded scienter by alleging that the defendants [] made a conscious decision to withhold material information").  *Sixth*, inference of scienter is further supported by the fact that the Defendants repeatedly spoke about the purported cost benefits of the Nanox.ARC product versus legacy X-ray sources.  ¶¶ 115-117. Because Defendants chose to speak about a topic of

---

[12] Defendants cite to *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 n.10 (S.D.N.Y. 2015) for the proposition that there is doubt on the continued viability of the "core operations doctrine" after passage of the PSLRA. Defs.' Mot. at 23. Yet the doctrine remains good law, the Second Circuit having yet to hold otherwise.

critical importance to their business—the Nanox.ARC, it is implausible that Defendants were not aware of crucial information in their possession that showed they could not manufacture the Nanox.ARC at the low cost they claimed, nor could it achieve the functionalities of the CT scanner. It is well settled that if executives speak about a topic of "critical importance", they cannot hide their heads in the sand and ignore crucial information at their fingertips about it. *City of Livonia Empls. Ret. Sys. v. Wyeth*, 2010 U.S. Dist. LEXIS 107729, at *6, *18-19 (S.D.N.Y. Sept. 29, 2010). Where, as here, "facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them." *In re Atlas*, 324 F. Supp. 2d at 489; *see Gauquie v. Albany Molecular Resch., Inc.*, 2016 U.S. Dist. LEXIS 97295, at *5-6 (E.D.N.Y. July 26, 2016); *see also KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 U.S. Dist. LEXIS 96499, at *29 (D.S.C. July 25, 2016) ("Bolstering the inference that Individual Defendants knew about these core operations are the allegations that they repeatedly spoke on these issues at conferences, on conference calls, and in press releases.").[13] [14]

---

[13] There are two additional facts indicative of scienter. *First,* the fact that Defendant Poliakine claimed in 4Q 2020 that all components were sourced for production of 1,000 units (¶ 128) and then reversed himself a quarter after (1Q 2021), stating, that the Company needed to delay the entire production wave because of tube sourcing problems (¶¶ 131-134) is indicative of scienter. His reversal shows his awareness of parts components, sourcing and cost matters, therefore, there is a strong inference that he had access to information about the cost of the parts components and that assembling the Nanox.ARC would cost more than represented. *Second,* the fact that Defendants ceased making the alleged misrepresentations concerning the cost estimate to assemble the Nanox.ARC, *after* receipt of the SEC subpoena, is indicative of scienter. *See* ¶¶ 136-141; *see also* Ex. 4 (Nano-X 2021 Form 20-F), containing no mention of the specific cost to assemble the Nanox.ARC. *Cf. Zola v. TD Ameritrade, Inc.*, 172 F. Supp. 3d 1055, at 1073-74 (D. Neb. 2016), *aff'd,* 889 F.3d 920 (8th Cir. 2018) (finding that the timing of changes in defendant's [practices], after disclosure that its vendors were investigated in connection with those [practices] makes a cogent and compelling showing of scienter. *Id.* at 1073-74).

[14] Defendants argue that as to Defendant Maayan, Plaintiff has alleged knowledge only by virtue of his position as CFO. Defs.' Mot. at 21, n. 9. Not so. Much like Defendant Poliakine, Defendant Maayan was aware of the manufacturing process of the Nanox.ARC. Thereby having the specific information about the cost of assembly. *See, e.g.,* Ex. 5 (Investor Call) at 26 (Defendant Maayan discussing the Japanese factory that was purported to manufacture the first 1,000 units and the ramping up of manufacturing in South Korea). Furthermore, Defendants' signatures on SEC filings during the Class period, which Plaintiff alleges contain misleading statements and omissions and Defendants' attestations as to the correctness of those filings are further indicative of scienter. *See, e.g., In re*

## VI.    ARGUMENT:  THE AC ADEQUATELY ALLEGES LOSS CAUSATION

Fed. R. Civ. P. 8(a)(2) applies to pleading loss causation; a plaintiff need only furnish the defendant with "some indication" of the causal connection between the misrepresentation and the loss to satisfy this standard.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). "Pleading loss causation is . . . not meant to impose a great burden on plaintiffs."  *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013 U.S. Dist. LEXIS 43774, at \*36 (S.D.N.Y. Mar. 27, 2013).  A plaintiff simply must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

The AC alleges that two corrective disclosures caused the price of Nano-X's securities to decline almost 8% and 5%, respectively.  *See In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010) ("the sharp drops of [the company's] stock price in response to certain corrective disclosures . . . are sufficient" to allege loss causation at the pleading stage). The announcement of the SEC subpoena (¶¶ 97-99) and the Oppenheimer Report (¶¶ 100-101) constitute partial corrective disclosures that together alerted the market to the fact that the Company misrepresented that it could manufacture the Nanox.ARC at the low cost represented and that it could perform the same functionalities as the CT scanner.  *First*, Defendants argue that the announcement of the SEC subpoena did not relate to the false comparability of devices and is therefore not corrective.  Defs.' Mot. at 23-24.  However, a revelation need not mirror the fraudulent misstatement to establish loss causation.  *See Freudenberg,* 712 F. Supp. 2d at 202; *In re Initial Pub. Offering Sec. Litig*., 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).  During the Class Period Defendants repeatedly misrepresented that the Nanox.ARC was comparable to the CT

---

*Cabletron Sys., Inc.*, 311 F.3d 11, 41 (1st Cir. 2002) (defendants' signatures on Form 10-K "accept[ing] responsibility for its contents" was indicative of scienter).

scanner *and* at a much lower cost—the two misrepresentations are inescapably intertwined.  The SEC subpoena revealed the falsity of their representations.  *Next*, Defendants argue that the SEC subpoena announcement is insufficient to plead loss causation.  Defs.' Mot. at 24.  Yet the announcement of an SEC investigation *can be* considered corrective.  "Announcements of government investigations regarding the subject of the misstatements alleged are also sufficient to plead loss causation."  *Bos. Ret. Sys. v. Alexion Pharm., Inc.,* 556 F. Supp. 3d 100, 140-41 (D. Conn. 2021).  "[C]ourts within this District have concluded that the disclosure of an investigation 'into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice.'"  *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.,* 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015).

*Finally,* contrary to Defendants' arguments (Defs' Mot. at 24) the Oppenheimer Report, which provided analysis and context to the disclosure of the subpoena is also corrective.  ¶ 100.  It is undisputed that:  (i) the Oppenheimer Report synthesized and spotlighted information that, while perhaps publicly available, was not properly evaluated by the market; (ii) the stock price significantly declined immediately after the publication; and (iii) Defendants do not proffer an alternative trigger for the decline.  Courts have held that reports that report on public information can be corrective if they include sufficient analysis.  *See Fogarazzo v. Lehman Bros., Inc.,* 341 F.Supp.2d 274, 290 (S.D.N.Y. 2004) (Loss causation properly pled against investment banks which allegedly misrepresented corporation's financial health even though banks had not concealed or withheld financial information and "the true facts were available for the world to see . . ."); *Jefferson Ins. Co. v. Rouhana (In re Winstar Communs.*), 2006 U.S. Dist. LEXIS 7618, at *47-49 (S.D.N.Y. Feb. 24, 2006) ("The claimed ability of Asensio to arrive at its findings by an examination of the publicly reported financials does not mean that a reasonable investor could

24

have drawn those same conclusions based on the total mix of the available information.").[15]

"There is no basis to conclude, as a matter of law, that the [analysis in the Oppenheimer Report] [was] already reflected in the price of [Nano-X] securities. In fact, [P]laintiff's allegations that the price of [Nano-X's] stock fell in the immediate wake of the issuance of [the] report [] belies such a conclusion." *Id.* at *47-49.

## VII.    ARGUMENT:  THE AC ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Control over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 240.12b-2.  Plaintiff plausibly alleges that Nano-X violated Section 10(b) and Rule 10b-5. Moreover, the Individual Defendants, who made the misrepresentations and omissions, had power to influence and control, and did influence and control Nano-X's "decision-making, including controlling the content and dissemination of the various statements that were false and misleading. [they] received, [and approved] copies of [Nano-X's] reports, public filings and other statements that were materially misleading and prior to [] these statements were issued. [They] had the ability to prevent the issuance of the statements or cause them to be corrected." *In re Puda Coal Sec. Inc.,* 2017 U.S. Dist. LEXIS 2122 (S.D.N.Y. Jan. 6, 2017) at *27-29; ¶¶ 142-145.  Thus, Individual Defendants were control persons and are also liable pursuant to Section 15 of the Exchange Act.

---

[15] *Mass. Ret. Sys. v. CVS Caremark Corp.,* 716 F.3d 229, 242 (1st Cir. 2013) is instructive. In *CVS Caremark*, defendants argued that CVS Caremark's loss of certain clients and the revenue impact was disclosed before the alleged corrective disclosure, a November 5 call, and therefore, discussion of the loss of these contracts in that call could not have been a corrective disclosure. However, the court held that what the market learned for the first time in that call was the real reason for the loss:  the failed integration of CVS and Caremark. That information, not the loss of the contracts themselves, is the corrective disclosure. Similarly, here, what investors learned from the Oppenheimer Report was not the receipt of the subpoena related to the cost of manufacturing the Nanox.ARC, but also the analyst's take that the SEC's focus could be connected to the Company's claims to be able to manufacture a $100 tube and to be able to produce the system for $10,000. ¶ 100; *see supra* 7.

## VIII.   CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.   Alternatively, Plaintiff requests leave to amend the AC.  *See* Fed. R. Civ. P. 15(a)(2).

Dated:  August 25, 2022

Respectfully submitted,

POMERANTZ LLP

*/s/ Veronica V. Montenegro*
Veronica V. Montenegro
Jeremy A. Lieberman
Marc I. Gross
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
vvmontenegro@pomlaw.com
jalieberman@pomlaw.com
migross@pomlaw.com

*Counsel for Davian Holdings Limited and Proposed Lead Counsel for the Class*

THE SCHALL LAW FIRM
Brian Schall (*pro hac vice* forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Davian Holdings Limited*