**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NANO-X SECURITIES LITIGATION | Case No.  1:21-cv-05517-RPK-PK<br><br>Hon. Rachel P. Kovner<br><br>Hon. Magistrate Judge Peggy Kuo |

**DECLARATION OF JUSTIN D. D'ALOIA IN SUPPORT OF:**
**(I) PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) CO-**
**LEAD COUNSEL'S UNOPPOSED MOTION FOR AN AWARD OF ATTORNEYS'**
**FEES, PAYMENT OF LITIGATION EXPENSES, AND AWARDS TO PLAINTIFFS**

**TABLE OF CONTENTS**

**Page**

TABLE OF EXHIBITS TO DECLARATION................................................................ iii

I.    INTRODUCTION .................................................................................................2

II.   PROSECUTION OF THE ACTION....................................................................7

     A.    Commencement Of The Litigation And Appointment Of Plaintiffs and Co-Lead Counsel ..........................................................................................7

     B.    The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint.................................................................................................8

     C.    Defendants' Efforts to Consolidate.................................................................9

     D.    Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response............9

     E.    Renewed Activity in the *White* Action .........................................................9

     F.    Mediation Efforts, Settlement Negotiations, And Preliminary Approval Of The Settlement ..................................................................................10

III.  THE RISKS OF CONTINUED LITIGATION.................................................12

     A.    Risks In Proving Liability ..............................................................................13

     B.    Risks In Proving Loss Causation And Damages ............................................16

     C.    Risks Faced In Obtaining And Maintaining Class Action Status ..................17

     D.    Other Risks.....................................................................................................18

     E.    The Settlement Is Reasonable In Light Of Potential Recovery In The Action ..............................................................................................19

IV.   CO-LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER..................................................................19

V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT..............22

VI.   CO-LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES................................................................25

     A.    The Fee Application........................................................................................25

1.    The Favorable Outcome Achieved Is The Result Of The Significant Time And Labor That Co-Lead Counsel Devoted To The Class Action ........................................................................................26

2.    The Magnitude And Complexity Of The Action .....................................29

3.    The Significant Risks Borne By Co-Lead Counsel .................................31

4.    The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Co-Lead Counsel, And The Standing And Caliber Of Defendants' Counsel ........................................................31

5.    The Requested Fee In Relation to the Settlement ...................................32

6.    Interests Of Public Policy, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases ........................................................................................32

7.    The Reaction Of The Settlement Class Supports Co-Lead Counsel's Fee Request ............................................................................................33

8.    Co-Lead Plaintiffs Support Their Counsel's Fee Request ........................33

B.    Payment Of The Requested Litigation Expenses  Would Be Fair And Reasonable .............................................................................................34

C.    PSLRA Awards For Co-Lead Plaintiffs ...............................................35

VII. CONCLUSION ........................................................................................37

ii

**TABLE OF EXHIBITS TO DECLARATION**

| EXHIBIT | TITLE |
|---|---|
| 1 | Declaration of Eric Blow Regarding (I) Notice Dissemination; (II) Publication of Summary Notice; (III) Call Center Services; (IV) The Settlement Website; and (V) Requests for Exclusion And Objections Received to Date, dated January 11, 2024 ("Blow Decl.") |
| 2 | Declaration of Justin D. D'Aloia on Behalf of Pomerantz LLP |
| 3 | Declaration of David J. Ross on behalf of Davian Holdings Limited (the "Ross Decl.") |

Justin D'Aloia, an attorney for Lead Plaintiffs, declares, pursuant to 28 U.S.C. § 1746, as follows:

1.        I, Justin D'Aloia, am a partner at Pomerantz LLP ("Pomerantz"), counsel for Court-appointed Lead Plaintiff Davian Holdings Limited ("Davian Holdings") and, together with Levi & Korsinsky LLP, preliminary Co-Lead Counsel for the proposed Settlement Class in this action (the "Action").[1]  I, or others under my supervision, have been actively involved in all aspects of the investigation and prosecution of this Action and the Parties' Settlement of the claims asserted on behalf of the Settlement Class in this Action or otherwise have knowledge thereof.  I am familiar with the factual matters discussed herein and each of these facts is true and correct to the best of my knowledge, information, and belief based on the evidence and other materials cited in support.

2.        I respectfully submit this Declaration in support of Plaintiffs' unopposed motion for final approval of the proposed $8,000,000 Settlement that the Court preliminarily approved by Decision and Order, dated October 31, 2023 (ECF No. 75) (the "Preliminary Approval Order"), and the proposed Plan of Allocation to distribute the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (collectively, the "Final Approval Motion").

3.        I also respectfully submit this Declaration in support of Co-Lead Counsel's motion for an award of attorneys' fees in the amount of 33% of the Settlement Fund, which equates to $2,666,666.67, plus interest earned at the same rate and for the same period as the Settlement Fund; payment of Co-Lead Counsel's unreimbursed out-of-pocket litigation expenses in the amount of $91,076.19; and awards to Co-Lead Plaintiffs of $3,000 each (totaling $9,000), in accordance with

---

[1] Unless defined herein, all capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated June 2, 2023 (the "Stipulation"). ECF No. 67-1.

1

the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses, including lost wages, incurred in connection with their representation of the Settlement Class during the course of this lengthy and hard-fought litigation (collectively, the "Fee and Expense Application").

4.      As set forth in the Stipulation, the proposed Settlement is part of a global agreement reached among the parties in the *In re Nano-X* Action and the *White* Action, and provides a recovery of $8,000,000 million in cash to resolve all claims that were or could have been brought in the *In re Nano-X* Action, including those that were brought in the *White* Action.

5.      As part of the Preliminary Approval Order, the Court directed that notice of the Settlement be disseminated to the Settlement Class. *See* ECF No. 75. Pursuant to the Preliminary Approval Order, the Court-approved Claims Administrator, Epiq Global ("Epiq"), implemented a comprehensive notice program under the direction of Co-Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and/or publication.

6.      To date, in total, more than 41,872 copies of the Notice and Proof of Claim and Release forms have been disseminated to potential Settlement Class Members and/or their nominees and, to date, no requests for exclusion have been received and no objections have been filed with the Court or received by Co-Lead Counsel. *See* Declaration of Eric Blow, dated January 11, 2024 ("Blow Decl."), attached hereto as Exhibit 1.

## I.      INTRODUCTION

7.      On September 16, 2020, a class action was filed against Nano-X in the Eastern District of New York captioned *White v. Nano-X Imaging Ltd.*, No. 20-cv-04355 (the "*White* Action"). *White* brought claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all investors who purchased Nano-X securities between August 21, 2020, and September 15, 2020, for alleged misrepresentations made by Defendants in the registration statement Nano-X filed with the SEC in connection with its IPO regarding its prospects for regulatory approval and about

2

projected benefits from its purported commercial agreements. Several days later a substantially identical complaint was filed in a separate action commenced in this Court captioned *Duarte v. Nano-X Imaging Ltd.*, No. 20-cv-4528 (the "*Duarte* Action"). Motions were filed to appoint a lead plaintiff and consolidate *Duarte* with *White*, which was ultimately assigned to the Honorable William F. Kuntz, II.

8.      Daniel McLaughlin filed the above-captioned action, the *In re Nano-X* Action, on October 5, 2021. Unlike *White*, the complaint in the *In re Nano-X* Action asserted claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all investors who purchased or acquired Nano-X securities between June 17, 2021 and August 18, 2021 for statements on topics different than those in the *White* Action. ECF No. 1.

9.      On December 21, 2021, Defendants filed letters in both the *White* Action and the *In re Nano-X* Action to have the *In re Nano-X* Action and the earlier filed *White* Action deemed related under Rule 50.3.1(d) of the Guidelines for the Division of Business Among Judges. On January 4, 2022, this Court ruled that the *In re Nano-X* Action was "not sufficiently related to . . . [*White*] and [*Duarte*] to justify reassignment" after consulting with Judge Kuntz and, accordingly, denied the request.

10.      After being appointed Lead Plaintiff in the *In re Nano-X* Action in January 2022 (ECF No. 22), Davian Holdings filed an amended complaint on April 12, 2022 (the "AC"). ECF No. 24. As amended, the AC sought to hold Defendants liable under Sections 10(b) and 20(a) of the Exchange Act for statements they made between August 21, 2020, and November 17, 2021 (the "Settlement Class Period"), in which they claimed their development-stage product, known as the Nanox System, (1) could be manufactured for $8,000 to $12,000 per unit; and (2) is functionally equivalent to existing imaging technology. The AC further alleged that this fraud was

3

exposed in November 2021 when the market learned that Nano-X received a SEC subpoena and Oppenheimer Equity Research published a report critically analyzing these matters.

11.    On June 3, 2022, Defendants moved in the *White* Action to consolidate the *In re Nano-X* Action with the *White* Action, arguing that the amendments made in the AC created new overlap with the *White* Action.

12.    On July 25, 2022, Defendants moved in the *In re Nano-X* Action to dismiss the claims asserted in the newly-filed AC for failure to state a claim under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4 ("PSLRA").  *See* ECF No. 50.  Among other things, Defendants argued that there were no materially false or misleading statements made during the alleged class period and that the AC failed to plead the elements of scienter and loss causation.

13.    On August 30, 2022, Judge Kuntz consolidated *Duarte* with *White*, appointed Edward Ko and Derson Jolteus as co-lead plaintiffs in *White*, and approved their selection of Levi & Korsinsky, LLP as lead counsel in *White*.

14.    Lead Plaintiffs in the *White* Action filed an amended complaint on October 31, 2022.  As amended, the new complaint in the *White* Action challenged statements made during the same class period as the original complaint but focused on statements regarding Nano-X's entry into revenue-generating distribution agreements and the timing of FDA approval.

15.    On November 3, 2023 Davian Holdings submitted a letter in the *White* Action to explain that the newly-filed complaint confirms that *White* and *In-re Nano-X* arise from separate frauds with distinct substantive issues and that consolidation remains inappropriate. The parties filed several additional letters on the subject.

4

16.	On November 21, 2022, Defendants sought leave in the *White* Action to file a motion to stay pending the outcome of the motion to dismiss in the *In re Nano-X* Action or, alternatively, to file a motion to dismiss in the *White* Action.

17.	On December 2, 2022, Judge Kuntz granted Defendants leave only to file a motion to stay in the *White* Action.  This motion was fully briefed and submitted as of February 7, 2023.

18.	In March 2023, Plaintiffs and Defendants recognized that a window opened for settlement discussions and agreed to attempt to resolve the Litigation on a global basis, *i.e.*, both *White* and *In re Nano-X*, as they awaited decisions on the pending motion to consolidate in the *White* Action, the motion to stay the *White* Action, and the motion to dismiss in the *In re Nano-X* Action.

19.	On April 3, 2023, counsel for the parties participated in a full-day, in-person mediation before experienced mediator Jed Melnick, Esq., of JAMS. In advance of the mediation, Co-Lead Counsel drafted and served a detailed mediation statement and thoroughly reviewed and analyzed the mediation statement received from Defendants.  After extensive discussion and negotiation with active involvement of the mediator, the parties reached an agreement in principle at the end of the day to settle the Litigation for $8,000,000, subject to the execution of settlement papers and approval by the Court. The parties subsequently continued to negotiate a term sheet, which they executed on April 28, 2023.

20.	The proposed Settlement provides for the resolution of all claims that were or could have been asserted in the Action in exchange for a cash payment of $8 million for the benefit of the Settlement Class.  As detailed herein, Co-Lead Plaintiffs and Co-Lead Counsel believe that the proposed Settlement represents an excellent result for the Settlement Class considering the significant risks of continued litigation.

5

21.     The Settlement was reached after almost three years of contested litigation.  Co-Lead Counsel's efforts involved, among other things: (i) conducting a comprehensive investigation into the allegedly wrongful acts, which included, among other things, a review and analysis of Nano-X's filings with the U.S. Securities and Exchange Commission ("SEC"), public reports concerning the Company, interviews with former employees and other potential witnesses with relevant information; (ii) additional extensive investigation after the appointment of lead plaintiff to amend the complaint in the *In re Nano-X* Action, which included consulting with experts and hiring an investigator to interview witnesses on multiple continents; (iii) drafting the 55-page amended complaint in this Action; (iv) a full briefing of Defendants' motion to dismiss in the *In re Nano-X* Action; (v) briefing and arguing several motions to have the Actions deemed related, consolidated, and/or stayed; (vi) numerous meet-and-confers; (vii) drafting and exchanging of written mediation statements; (viii) participation in a full-day, in-person mediation session before experienced mediator Jed Melnick, Esq., of JAMS; and (ix) engaging in negotiations regarding the terms of the proposed Settlement.

22.     Based on the foregoing efforts, Co-Lead Plaintiffs and Co-Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a very favorable outcome for the Settlement Class and is in the best interests of its members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Co-Lead Counsel respectfully submit that the Settlement is fair, reasonable, and adequate in all respects, and the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

23.     In addition, Co-Lead Plaintiffs seek approval of the proposed Plan of Allocation, which is discussed below.  Co-Lead Counsel developed the Plan of Allocation with the assistance

of Plaintiffs' damages consultant. The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis, as described further below, based on their Recognized Loss amounts relative to the total amount of Recognized Losses.

24. Finally, Co-Lead Counsel seek approval of their request for attorneys' fees and payment of Litigation Expenses, as set forth herein and in the accompanying Memorandum of Law in Support of Co-Lead Counsel's Unopposed Motion for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Awards to Plaintiffs ("Fee Brief"). As discussed in detail in the accompanying Fee Brief, the requested 33% fee is well within the range of percentage awards granted by courts in this Circuit in comparable complex litigation. Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved. Likewise, the requested Litigation Expenses of $91,076.19 and the requested awards to each Co-Lead Plaintiff pursuant to the PSLRA are also fair and reasonable under the circumstances of this case. Accordingly, for the reasons set forth in the Fee Brief and for the additional reasons set forth herein, Co-Lead Counsel respectfully submit that the request for attorneys' fees and payment of expenses be approved.

## II.      PROSECUTION OF THE ACTION

### A.      Commencement Of The Litigation And Appointment Of Plaintiffs and Co-Lead Counsel

25. On September 16, 2020, the *White* Action was filed against Nano-X in the Eastern District of New York. *White* brought claims under Sections 10(b) and 20(a) of the Exchange Act on behalf of all investors who purchased Nano-X securities between August 21, 2020, and September 15, 2020, for alleged misrepresentations made by Defendants in the registration statement Nano-X filed with the SEC in connection with its IPO regarding its prospects for

regulatory approval and about projected benefits from its purported commercial agreements. Several days later a substantially identical complaint was filed in a separate action commenced in this Court captioned *Duarte v. Nano-X Imaging Ltd.*, No. 20-cv-4528 (the "*Duarte* Action"). Motions were filed to appoint a lead plaintiff and consolidate *Duarte* with *White*, which was ultimately assigned to the Honorable William F. Kuntz, II. On August 30, 2022, Judge Kuntz consolidated *Duarte* with *White*, appointed Edward Ko and Derson Jolteus as co-lead plaintiffs in *White*, and approved their selection of Levi & Korsinsky, LLP as lead counsel in *White*.

26.    Daniel McLaughlin filed the above-captioned action (the "*In re Nano-X* Action") on October 5, 2021.  On January 25, 2022, the Court appointed Davian Holdings as lead plaintiff in the *In re Nano-X* Action, and approved Pomerantz LLP as lead counsel. (Dkt. No. 22).

**B.    The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint**

27.    Following Davian Holding's appointment as Lead Plaintiffs, counsel conducted a comprehensive investigation into Nano-X's allegedly wrongful acts, which included, *inter alia*, (1) reviewing and analyzing Nano-X's filings with the SEC, and other publicly available material related to the Company, including news articles, analyst reports, press releases, investor presentations, Nano-X's website and other public statements issued by, or about, the Company, and information published in connection with the SEC subpoena and Oppenheimer Equity Research report; and (2) interviews (with the aid of a private investigator) of former Nano-X employees and others individuals with relevant knowledge on multiple continents, and consultation with experts.

28.    On April 12, 2022, Davian Holdings filed the operative 55-page amended complaint (the "AC"), which asserted claims against Defendants under Sections 10(b) and 20(a) of the Exchange Act.  *See* ECF No. 24.  Among other things, the Complaint alleged that Defendants

8

violated Sections 10(b) and 20(a) by making certain statements which claimed that Nano-X's lead product candidate, known as the Nanox System, (1) could be manufactured for $8,000 to $12,000 per unit; and (2) is functionally equivalent to existing imaging technology.   In addition to alleging that these and other statements were false and misleading, the Complaint alleged that this fraud was exposed in November 2021 when the market learned that Nano-X received a SEC subpoena and Oppenheimer Equity Research published a report critically analyzing these matters.

### C.      Defendants' Efforts to Consolidate

29.      On December 21, 2021, Defendants filed letters in both the *In re Nano-X* Action and the *White* Action to have the two actions deemed related under Rule 50.3.1(d) of the Guidelines for the Division of Business Among Judges.  On January 4, 2022, this Court ruled that *McLaughlin* was "not sufficiently related to . . . [*White*] and [*Duarte*] to justify reassignment" after consulting with Judge Kuntz and, accordingly, denied the request.

30.      On June 3, 2022, Defendants moved in the *White* Action to formally consolidate the *In re Nano-X* Action with the *White* Action.  Among other things, Defendants argued that the amendments made in the AC created new overlap with the *White* Action.

### D.      Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response

31.      On July 25, 2022, Defendants moved to dismiss the AC (the "Motion to Dismiss"). *See* ECF Nos. 50-52.  On August 25, 2022, Lead Plaintiff in the *In re Nano-X* Action served its opposition to Defendants' Motion to Dismiss, and on September 9, 2022, Defendants served their reply in further support of their Motion. ECF Nos. 53-56.

### E.      Renewed Activity in the *White* Action

32.      On August 30, 2022, Judge Kuntz consolidated *Duarte* with *White*, appointed Edward Ko and Derson Jolteus as co-lead plaintiffs in *White*, and approved their selection of Levi & Korsinsky, LLP as lead counsel in *White*.

9

33. Lead Plaintiffs in the *White* Action filed an amended complaint on October 31, 2022. As amended, the complaint in the *White* Action added new allegations relating to statements regarding the regulatory approval prospects for the Nanox System given alleged known deficiencies with its applications and Nano-X's distributors' ability to carry out their contracts because they lacked experience in the medical-imaging field.

34. On November 3, 2022, Davian Holdings submitted a letter in the *White* Action to explain that the newly-filed complaint confirms that *White* and *In-re Nano-X* arise from separate frauds with distinct substantive issues and that consolidation remains inappropriate. The parties filed several additional letters on the subject thereafter.

35. On November 21, 2022, Defendants sought leave from the Court in the *White* Action to file a motion to stay that action pending the outcome of the motion to dismiss in the *In re Nano-X* Action, or, in the alternative, leave to file a motion to dismiss in the *White* Action. On December 2, 2022, Judge Kuntz granted Defendants leave to file a motion to stay in the *White* Action. This motion was fully briefed and submitted as of February 7, 2023.

**F.      Mediation Efforts, Settlement Negotiations, And Preliminary Approval Of The Settlement**

36. In March 2023, the parties in this action and their counsel, along with the *White* Lead Plaintiffs and their counsel, recognized that a window had opened for settlement discussions and agreed to attempt to resolve the Litigation on a global basis, *i.e.*, resolve both Actions, as they awaited decisions on the motion to consolidate the two actions, the motion to stay the *White* Action, and the motion to dismiss in the *In re Nano-X* Action.

37. On April 3, 2023, counsel for the parties in the two actions participated in a full-day, in-person mediation before experienced mediator Jed Melnick, Esq. of JAMS, with Nano-X representatives attending remotely from Israel. In advance of the mediation, both sides exchanged

10

written mediation statements and supporting exhibits, which addressed the issues of both liability and damages.

38. The mediation was successful. Following the full-day of mediation, and after continuing to negotiate following the mediation under the mediator's supervision, the parties reached an agreement in principle to settle the Litigation for $8,000,000, which was memorialized in a Confidential Settlement Term Sheet ("Term Sheet") executed on April 28, 2023.

39. On May 3, 2023, the parties informed the Court that they had reached a settlement for both the *In re Nano-X* and *White* Actions and requested that all proceedings be stayed pending the parties' further applications related to the approval of the settlement. ECF No. 64. On May 5, 2023, the Court granted the request to stay.

40. Thereafter, the parties negotiated the terms of the settlement papers, including the Stipulation. The parties ultimately executed the Stipulation on June 2, 2023. ECF No. 67-1.

41. On June 2, 2023, Plaintiffs filed an Unopposed Motion for Preliminary Approval of Class Action Settlement (the "Preliminary Approval Motion"), together with supporting papers, including a fully executed copy of the Stipulation, which set forth the terms and conditions of the Settlement, and all exhibits thereto. ECF Nos. 65-68.

42. On June 6, 2023, Plaintiffs' Preliminary Approval Motion was referred to Magistrate Judge Peggy Kuo. Later that day, Magistrate Judge Kuo scheduled a telephonic hearing for June 13, 2023 to discuss the Preliminary Approval Motion.

43. Later on June 6, 2023, the Court denied Defendants' pending Motion to Dismiss the AC in light of their representation that they have reached a settlement in principle and filed papers seeking preliminary approval thereof.

44. Magistrate Judge Kuo held a hearing on the motion on June 14, 2023, during which the parties explained that, because all class members in the *White* Action are members of the broader class in the *In re Nano-X* Action, the parties believe the global settlement need only be approved by the court in one of the pending actions and proposed that it would be most efficient for the approval motion, and other motions relating to the settlement, to be heard before this Court in the *In re Nano-X* Action. During this hearing, the Court directed the parties to revise certain passages in the settlement papers to clarify the posture and relationship of the *White* Action and the *In re Nano-X* Action, as set forth in a minute entry dated June 14, 2023.

45. On July 6, 2023, Plaintiffs submitted revised settlement papers with the Court. *See* ECF No. 72. As revised, and while limiting references to the *White* Action, the settlement papers advised potential Settlement Class Members that (i) all members of the proposed class in the *White* Action are members of the broader class in the *In re Nano-X* Action; (ii) the proposed Settlement Class here fully encompasses the claims asserted on behalf of the proposed class in the *White* Action; and (iii) the parties have agreed to voluntarily dismiss the *White* Action upon the entry of a judgment approving the Settlement in this Action.

46. On October 31, 2023, the Court entered a Decision and Order preliminarily approving the Settlement, preliminarily certifying the Settlement Class for purposes of the Settlement, and authorizing notice of the Settlement to be distributed to the Settlement Class. *See* ECF No. 75. As provided therein, the Court ordered that objections to the Settlement, or requests to be excluded from the Settlement Class, must be received by January 25, 2024, and scheduled a Settlement Hearing for February 15, 2024, at 11:00 a.m.

## III.    THE RISKS OF CONTINUED LITIGATION

47. The Settlement provides a certain and substantial benefit to the Settlement Class in the form of a non-reversionary cash payment of $8 million. As explained more fully below, there

were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through continued litigation to a jury trial, followed by additional inevitable appeals.  Before trial and a potentially litigated verdict, the most immediate risks faced by the Settlement Class are related to specific risks of continued litigation, particularly the risks of prevailing on Defendants' motion to dismiss in the *In re Nano-X* Action, which would make dismissal in the *White* Action also likely.  Even if Lead Plaintiffs survived Defendants' motion(s) to dismiss, the parties would then face a lengthy and expensive discovery process in a case whose allegations revolve around complex medical equipment technology, briefing of class certification and summary judgment motions, and a trial with an uncertain outcome. Discovery costs, including document production and hosting fees, as well as experts— for class certification, loss causation, damages, and subject-matter—would easily reach into the millions of dollars. The fact that Nano-X is a foreign corporation headquartered in Israel and the majority of the documents and evidence would have been located in Israel and in Hebrew posed further difficulties in terms of access to documents and the need to translate them, as well as for the conducting of depositions and trial. Not only would any recovery at trial be very uncertain, with the near-certainty of appeals, it would inevitably be delayed by years.  There was no guarantee that Plaintiffs and the Settlement Class would surmount these hurdles and, even if they did, later achieve any recovery, let alone one greater than $8 million.

### A.      Risks In Proving Liability

48.      Plaintiffs in the *White* Action allege that Defendants misled investors regarding (1) its entry into revenue-generating distribution agreements and (2) the timing of FDA approval for the Nanox System. Plaintiffs in the *In re Nano-X* Action allege that Defendants misled investors by representing that the Nanox System (1) could be manufactured for approximately $10,000 per unit (a fraction of the cost for current systems); and (2) is functionally equivalent to existing

technology.  Both sets of allegations would have been difficult to establish, including at summary judgment or trial.

49.    For example, in the *In re Nano-X* Action, Plaintiffs would have had to adequately plead and prove that Defendants' statements about the lower costs for Nanox.ARC were false considering the economies of scale for mass production outside of the United States.  Plaintiffs would have also had to prove that Defendants' statements purportedly comparing the Nano.ARC to CT machines were misleading, even though Defendants disclosed that certain models of the Nanox.ARC were a tomosynthesis imaging system.

50.    In the *White* Action, Plaintiffs would have had to overcome Defendants' arguments that the complaint was devoid of independent factual allegations outside of the Citron Report. Moreover, Defendants' statements about Nano-X's agreements with its distributors disclosed details about the contracts, including their names and relevant conditions precedent under the contracts, such that Defendants would have argued the market was sufficiently on notice of the nature of the customers. Nano-X also disclosed its FDA submission strategy, the status of the FDA submissions, and its expectations.

51.    In both actions, Plaintiffs faced challenges regarding pleading and establishing a strong inference of scienter. While not required to do so, the complaints do not allege that Defendants had a motive or opportunity to commit fraud and relied on allegations that Defendants knew, or should have known, regarding their allegedly false and misleading statements.

52.    When the Settlement was reached, Defendants' motion to dismiss in the *In re Nano-X* Action was pending. While Plaintiffs believed they had merit, there was a real possibility the Court would grant Defendants' motion to dismiss in the *In re Nano-X* Action, which would make dismissal in the *White* Action also likely. Moreover, even if Plaintiffs survived Defendants'

14

motion(s) to dismiss, they would face significant obstacles in discovery. Because this case concerns complex medical devices and the arcana of FDA approvals, Plaintiffs would have to rely on subject-matter consulting experts to evaluate virtually all the discovery they received, increasing costs and risks. Further, because of the highly technical and complex subject matter, many fact depositions would be as complicated and difficult as expert depositions in other lawsuits.

53.    If Plaintiffs survived Defendants' motion to dismiss (in either Action), they would have to conduct document discovery and depositions in a case whose allegations revolve around complex medical equipment technology. There was a substantial risk Plaintiffs might not develop sufficient evidence to survive summary judgment, and if they did, they would be trying a securities fraud case before a jury against Defendants who are attempting to develop a more accessible and affordable diagnostic imaging device which would arguably bring significant societal benefit.

54.    Assuming Plaintiffs successfully moved for class certification, which would likely entail extensive expert reports, and managed to secure favorable evidence through very complex discovery, they would have to survive Defendants' motions for summary judgment. Plaintiffs would rely substantially on expert evidence, including to explain the science underlying Nano-X's imaging devices, to prove loss causation and damages. Because Plaintiffs bear the burden of proof, Defendants could win at summary judgment on any number of issues through a well-placed *Daubert* motion. Moreover, for securities fraud claims, Plaintiffs also must plead and prove scienter, which is inherently difficult. While Co-Lead Counsel believe that they would be able to adduce sufficient evidence to do so, Co-Lead Counsel were well aware of the high hurdle they would have to meet in order to prove that the Defendants acted with scienter under the federal securities laws. There is no doubt that Defendants would continue to advance numerous scienter

arguments that posed very significant hurdles to proving that they acted with an intent to commit securities fraud or with severe recklessness.

55.    Further, Plaintiffs would have to present their case to a jury and prevail.  These are difficult cases to try from plaintiffs' perspective.  Defendants would likely seek to appeal to a jury's sympathy, arguing they are developing a more accessible and affordable diagnostic imaging device for those currently without access to such technology, due to the cost and complexity of current imaging systems.  Even to explain why the Defendants' statements are false, Plaintiffs would have to explain and compare the capabilities of various medical imaging devices, their component parts, and the regulatory approval process.  Plaintiffs would rely on their experts, but Defendants would counter with their opposing experts.  With a battle of the experts over complex subject-matter, jury confusion would be a significant danger for Plaintiffs, which could lead to jurors simply concluding that Plaintiffs had not sufficiently proven they were entitled to relief. Plaintiffs would also need the jury to credit their experts to prove loss causation and damages, adding another layer of uncertainty.

## B.    Risks In Proving Loss Causation And Damages

56.    Even assuming that Co-Lead Plaintiffs overcame the risk of establishing Defendants' liability, as discussed above, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.

57.    Expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.   A jury's reaction to such expert testimony is highly unpredictable, and Plaintiffs recognize that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and find there were no damages, or that they were only a fraction of the amount claimed by Plaintiffs.  Thus, the amount of damages that the class would actually recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was no assurance that

Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial. These issues could have seriously affected Plaintiffs' ability to successfully prosecute the Action.

58.     Even if they prevailed at trial, Plaintiffs would have to survive Defendants' inevitable appeals. This case would generate more than its share of appellate issues because it relies so heavily on complex expert matters. Reversal of the Court's decision on any expert matter could upset the judgment the Settlement Class had spent time and money securing.

59.     In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment, trial, or appeal, they could have dramatically limited—if not eliminated—any potential recovery by the class.

### C.     Risks Faced In Obtaining And Maintaining Class Action Status

60.     Additionally, Lead Plaintiffs had not yet filed a motion for class certification when the parties agreed to settle. In deciding a motion for class certification, the class would face the risk of arguments by Defendants grounded on any even potential factual dissimilarity of claims asserted by Plaintiffs and putative class members. If successful, the defense would mandate individual lawsuits, many with minimal amounts of damages accrued. Even if a class were certified over Defendants' objection, it would face multiple challenges with respect to proving the class-wide nature of Defendants' securities law violations at trial.

61.     To be entitled to class certification, Co-Lead Plaintiffs must show that common issues predominate over individual ones. If not for Defendants' consent to certify the Settlement Class, Plaintiffs would have to meet their burden by showing that Nano-X Securities traded on an efficient market, entitling class members to the presumption of reliance on Defendants' materially false statements. Defendants would have been permitted to rebut the presumption by proving that there was no price impact. Under *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258

17

(2014), Defendants would have been permitted to rebut the presumption by proving that there was no price impact. While it is not unusual for courts to certify securities class actions, it is not automatic. The law governing certification of securities class actions has been in constant flux, as evidenced by *Halliburton* and the Supreme Court's decision in *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021).

62.     Moreover, even if Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery.

63.     In sum, without a settlement, even assuming the evolving law does not change further, the Settlement Class risked that certification would be denied. Further, even if the Court were to certify the class, there is always a risk that the certified class could be decertified at a later stage in the proceedings.

### D.     Other Risks

64.     In addition to the pending second motion to dismiss, Co-Lead Plaintiffs would have had to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this Action.

65.     Plaintiffs would have to successfully navigate and prevail against Defendants' eventual motion(s) for summary judgment, and at trial. Each of these several stages of litigation presents significant risks in complex class actions such as this one. Co-Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

66.     Even if Plaintiffs succeeded in proving all the elements of their case at trial and obtained a jury verdict, Defendants almost certainly would have appealed. An appeal not only would have renewed the risks faced by Plaintiffs—as Defendants would have reasserted their

arguments summarized above—but also would have resulted in significant additional delay. Given these significant litigation risks, Plaintiffs and Co-Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

### E.    The Settlement Is Reasonable In Light Of Potential Recovery In The Action

67.    In addition to the risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. Plaintiffs have estimated recoverable damages, under a two-trader model, of approximately $86.7 million in the *White* Action for a Class Period of August 21, 2020 through September 15, 2021, and approximately $91.0 million in the *In re Nano-X* Action, which as stated above alleges that the corrective disclosure and stock price decline occurred in November 2021—for total estimated damages of $177.7 million. But this amount could be far less depending on various scenarios.[2]  Indeed, the recovery here is approximately 4.5% of estimated damages, above the 1.8% median percentage recovery in securities class actions in 2022.

68.    However, if Defendants prevailed on any or all of their arguments concerning liability, Plaintiffs would have recovered far less, if anything.

## IV.    CO-LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER

69.    Pursuant to the Preliminary Approval Order, Co-Lead Counsel and the Court-approved Claims Administrator, Epiq, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail and publication.

70.    The Preliminary Approval Order directed that the Notice and Claim Form be mailed to potential Settlement Class Members and set a deadline of January 25, 2024 (21 calendar days

---

[2] Defendants estimated damages to be much less than Plaintiffs.

before the final Settlement Hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement.

71.     Pursuant to the Preliminary Approval Order, Co-Lead Counsel instructed Epiq to disseminate copies of the Notice and Claim Form and to publish the Summary Notice. Contemporaneously with the mailing of the Notice, Co-Lead Counsel instructed Epiq to post downloadable copies of the Notice and Claim Form online at www.NanoXSettlement.com (the "Settlement Website").

72.     The Notice, attached as Exhibit A to the Blow Declaration, provides potential Settlement Class Members with information about the terms of the Settlement and contains, among other things: (i) a summary of the Settlement, including the $8 million Settlement Amount; (ii) the proposed Plan of Allocation; (iii) that Co-Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33% of the Settlement Fund (*i.e.*, $2,666,666.67), plus interest, as well as Litigation Expenses, which may include an application for reimbursement to Plaintiffs for their costs and expenses related to their representation of the Settlement Class; (iv) that any Settlement Class Member could object to the requested attorneys' fees and Litigation Expenses; (v) an explanation of the reasons for the Settlement; (vi) that requests for exclusion from the Settlement must be submitted to the Claims Administrator no later than January 25, 2024; (vii) that objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application must be filed with the Court no later than January 25, 2024; and (viii) the deadline for submitting a Release and Proof of Claim form.

73.     As detailed in the Blow Declaration, Epiq mailed the Notice to potential Settlement Class Members as well as banks, brokerage firms, and other third-party nominees whose clients

20

may be Settlement Class Members.  Ex. 1 at ¶¶ 4-5, 7.  To disseminate the Notice, beginning on November 21, 2023, Epiq mailed a copy of the Notice to the individuals and organizations identified in the Company's transfer agent records.  *See id.* at ¶ 4.  In addition, Epiq maintains a proprietary database with names and addresses of the largest and most common banks, brokerage firms, institutions, and other third-party nominees.  On November 21, 2023, Epiq caused the Notice to be mailed to the 1,294 nominees and institutional groups contained in the Epiq master mailing list.  *Id.* at ¶¶ 4-5.  The Notice directed those who purchased, or otherwise acquired, publicly traded Nano-X Securities during the Class Period for the beneficial interest of a person or organization other than themselves to either: (I) provide Epiq with the names, addresses, and email addresses (if available) of such beneficial owners no later than ten (10) calendar days after such nominees' receipt of the Notice Packet; (II) send a copy of the Summary Notice to such beneficial owners by email no later than ten (10) calendar days after such nominees' receipt of the Notice Packet; or, (III) request within ten (10) calendar days of receipt of the Notice Packet copies of the Postcard Notice from the Claims Administrator, and send a copy of the Postcard Notice to such beneficial owners, no later than ten (10) calendar days after receipt of the copies.  *Id.* at ¶ 5.

74.    As of January 10, 2024, the Notice had been sent to 41,872 potential Settlement Class Members and/or their nominees.  *See id.* at ¶ 8.

75.    On December 1, 2023, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be transmitted over *PR Newswire*.  *See id.* at ¶ 9; Ex. B (confirmations of publications).

76.    Co-Lead Counsel also caused Epiq to establish the dedicated Settlement Website, which became operational on November 21, 2023, to provide potential Settlement Class Members with information concerning the Settlement, including exclusion, objection, and claim-filing

deadlines for the case; an online claim filing portal; the date and time of the Settlement Hearing; and downloadable versions of the Notice and Claim Form, as well as copies of the Stipulation and Preliminary Approval Order.  Bowl Decl. ¶¶ 13-14.

77.     Epiq maintains a toll-free telephone number for potential Settlement Class Members to call and obtain information about the Settlement and/or request a Notice and Claim Form.  Epiq promptly responds to each telephone inquiry and will continue to address potential Settlement Class Members' inquiries.  *Id.* at ¶¶ 10-12.

78.     As set forth above, the Notice and Summary Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application is January 25, 2024, and that the deadline to request exclusion from the Settlement Class is January 25, 2024.  To date, no requests for exclusion have been received.  *Id.* at ¶ 15.

79.     In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the amount of attorneys' fees and expenses referenced in the Notice have been entered on this Court's docket or have otherwise been received by Co-Lead Counsel or Epiq.  Co-Lead Counsel will file reply papers by February 8, 2024, which will address any objections that may be received. Co-Lead Counsel's reply papers will include a supplemental declaration from Epiq addressing whether any requests for exclusion have been received.

## V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

80.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Fee and Expense Award, including interest thereon; (b) any Lead Plaintiff Award for representing the interests of the Settlement Class; (c) Notice and Administration Expenses; (d) Settlement Fund Taxes and Tax Expenses; and (e) any other Court-

approved deductions) must submit a valid Claim Form with all required information postmarked no later than February 19, 2024. As set forth in the Notice, the Net Settlement Fund will be distributed among eligible Settlement Class Members according to the plan of allocation approved by the Court.

81.    In return, the parties have agreed to dismiss the *In re Nano-X* Action and *White* Action with prejudice as set forth in the Stipulation, and Lead Plaintiffs and all Settlement Class Members who do not exclude themselves from the Settlement Class agree to release, relinquish and discharge all Released Claims against the Defendants and their respective Related Parties (collectively, the "Released Defendant Parties"), whether or not these Class Members execute and deliver Proof of Claim and Release forms. This release includes, among other terms, all claims asserted in the *In re Nano-X* Action as well as all claims asserted in the *White* Action.

82.    Co-Lead Counsel believe that the proposed Plan of Allocation, as modified, provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members based on their respective economic losses resulting from the securities law violations alleged the *In re Nano-X* Action as well as all claims asserted on their behalf in the *White* Action.

83.    The proposed Plan of Allocation was created with the assistance of a consulting damages expert. The Plan is set forth on pages 8 to 10 of the Notice. *See* Bowl Decl., Ex. A. The Plan of Allocation has been developed to provide recovery to Settlement Class Members for damages claimed in both the *In re Nano-X* Action and the *White* Action. Only one Proof of Claim and Release form needs to be submitted, as described below. As described in the Notice, the calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a

trial.  Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  The computations under the Plan of Allocation are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

84.     Under the Plan of Allocation, a "Recognized Loss Amount" for each share of publicly traded or publicly listed Nano-X securities purchased or otherwise acquired during the Settlement Class Period (*i.e.*, between August 21, 2020 and November 17, 2021, inclusive) will be calculated depending upon several factors, including when the shares were purchased or otherwise acquired and in what amounts, whether the shares were ever sold, and, if so, when they were sold and for what amounts. The Claims Administrator shall determine each Settlement Class Member's share of the Net Settlement Fund based upon the recognized loss formula.  In general, the Recognized Loss Amount will be calculated as set forth for each purchase or acquisition of publicly traded or publicly listed shares of Nano-X securities during the Settlement Class Period that is listed in the Proof of Claim and Release and for which adequate documentation is provided. To the extent that the calculation of an Authorized Claimant's Recognized Loss Amount results in a negative number, that number shall be set to zero. The sum of an Authorized Claimant's Recognized Loss Amounts will be the Authorized Claimant's "Recognized Claim." Under the proposed Plan of Allocation, each claimant will receive a *pro rata* share of the Net Settlement Amount, with that share to be determined by the ratio that the claimant's allowed claim bears to the total allowed claims of all claimants.

85.     In sum, the Plan of Allocation will fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered by purchasing their Nano-X securities at artificially inflated prices, that were attributable to the

24

conduct alleged in both the *In re Nano-X* Action and the *White* Action.  Accordingly, Co-Lead Counsel respectfully submit that the Plan of Allocation, as modified, is fair and reasonable and should be approved by the Court.

86.   To date, no objections to the proposed Plan of Allocation have been received by Co-Lead Counsel or the Claims Administrator, or posted on the Court's docket.  *See* Bowl Decl. ¶ 15.

## VI.   CO-LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES

87.   In addition to seeking final approval of the Settlement and Plan of Allocation, Co-Lead Counsel are applying for a fee award of 33% of the Settlement Fund (or $2,666,667), plus interest earned at the same rate and for the same period as the Settlement Fund.  Co-Lead Counsel also request payment of Litigation Expenses from the Settlement Fund in the amount of $91,076.19 in expenses that Co-Lead Counsel incurred in connection with the prosecution of the Action, plus interest earned at the same rate and for the same period as the Settlement Fund.  Finally, Co-Lead Counsel also seek awards to Lead Plaintiffs, Davian Holdings Limited, Derson Jolteus and Edward Ko Altimeo, in the amounts of $3,000 each (totaling $9,000) for their representation of the class, as authorized by the PSLRA.  The total Litigation Expenses amount of $91,076.19 is below the maximum expense amount of $250,000 set forth in the Notice.  The legal authorities supporting Co-Lead Counsel's request for an award of attorneys' fees and Litigation Expenses are set forth in the accompanying Fee Brief, filed concurrently herewith.  The primary factual bases for the requested fee and Litigation Expenses are summarized below.

### A.   The Fee Application

88.   Co-Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the Settlement Class.  As discussed

below and in the Fee Brief, based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Co-Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved.

### 1.   The Favorable Outcome Achieved Is The Result Of The Significant Time And Labor That Co-Lead Counsel Devoted To The Class Action

89.   Co-Lead Counsel spent considerable time prosecuting this Action on behalf of the Settlement Class.  As previously described above, Co-Lead Counsel, among other things:

- performed a preliminary investigation into the legal and factual bases for potential claims against Defendants before drafting and filing the initial complaint;

- drafted the initial complaint and moved for appointments of lead plaintiff and lead counsel;

- negotiated and filed a joint stipulation accepting service and setting deadlines for case activity following the appointment of a lead plaintiff;

- opposed Defendants' letter request to have this Action and the *White* Action deemed related under Rule 50.3.1(d) of the Guidelines for the Division of Business Among Judges (*see* ECF No. 18);

- negotiated and filed joint schedules for the filing of an amended complaint and any motion to dismiss;

- performed a comprehensive investigation into the legal and factual bases for potential claims against Defendants, which investigation included  a review and analysis of Nano-X's filings with the SEC and other publicly available material related to the Company, including news articles, analyst reports, press releases, investor presentations, interviews of individuals with relevant knowledge on multiple continents with the aid of a private investigator, and consultation with experts, all of which allowed Co-Lead Counsel to expand the operative class period and/or scope of the claims;

- utilized the foregoing comprehensive investigation and additional research to draft and file lengthy and comprehensive amended complaints, which asserted claims against Defendants under Sections 10(b) and 20(a) of the Exchange Act;

- researched and drafted an opposition brief in response to Defendants' motion to consolidate;

26

- researched and drafted an opposition brief in response to Defendants' motion to dismiss;

- prepared and filed responses to Defendants' pre-motion letters with respect to motions to dismiss and/or stay;

- prepared and submitted written mediation statements concerning the facts of the case, liability, and damages, together with supporting exhibits;

- submitted letters addressing the impact of the amended pleadings on the pending motion to consolidate;

- participated in a full-day, in-person mediation session overseen by a highly experienced third-party mediator, Jed Melnick, Esq., of JAMS, which involved an exchange of written submissions concerning the facts of the case, liability and damages, and extensive consultation with the mediator following the mediation session;

- engaged in various post-mediation activities and negotiated a detailed confidential settlement term sheet with Defendants' counsel, which was executed on April 28, 2023;

- drafted and then negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel;

- worked with a damages expert to craft a plan of allocation that treats Co-Lead Plaintiffs and all other members of the proposed Settlement Class fairly;

- drafted the Preliminary Approval Motion and supporting papers;

- oversaw the implementation of the notice process; and

- drafted the Motion for Final Approval and supporting papers.

90.    Attached hereto is a declaration in support of the request for an award of attorneys' fees and payment of Litigation Expenses.  *See* Declaration of Justin D. D'Aloia on Behalf of Pomerantz LLP (the "Pomerantz Declaration"), attached hereto as Exhibit 2.

91.    Included with these declarations are schedules that summarize the time spent prosecuting this Action by each firm, as well as Litigation Expenses by category (the "Fee and Expense Schedules").  The attached declaration and the Fee and Expense Schedules included

27

therein report the amount of time spent by attorneys and professional support staff and the "lodestar" calculations, *i.e.*, their hours multiplied by their current hourly rates.[3]

92.     As set forth above and in detail in Exhibits 3 and 4, Co-Lead Counsel have collectively expended a total of 1,645.01 hours in the investigation and prosecution of the Action. The resulting total lodestar is $1,092,221.25.  The requested fee amount of 33% of the Settlement Fund equals $2,666,667 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a reasonable 2.44 multiplier of Co-Lead Counsel's lodestar.

93.     Co-Lead Counsel will continue to work towards effectuating the Settlement in the event the Court grants final approval.  Among other things, Co-Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member's claims, will respond to shareholder inquiries, and will oversee the distribution process.  No additional compensation will be sought for this work, other than expenses incurred with respect to claims administration and expenses for any other necessary activities to conclude the administration.

94.     As detailed above, throughout this litigation, Co-Lead Counsel devoted substantial time to the prosecution of the Action.  Co-Lead Counsel maintained control of, and monitored the work performed by lawyers and other personnel on this case.  Experienced attorneys at Pomerantz and Levi & Korsinsky were involved with drafting, reviewing and/or editing pleadings, court filings, and the mediation submissions, communicating with Plaintiffs, the mediation process, negotiating the terms of the Settlement, the Term Sheet, the Stipulation, and other matters.  More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level.  Throughout the Litigation, Co-Lead Counsel maintained an appropriate level of staffing

---

[3] Time expended in preparing the Fee and Expense Application has not been included.

that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Litigation.

95.    Co-Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, we respectfully submit that the requested fee is reasonable and should be approved.

### 2.    The Magnitude And Complexity Of The Action

96.    Securities class action cases are known for their notorious complexity.  This case was no different. As detailed above, this Action presented many novel and complex issues, including (i) conducting a robust international investigation into the legal and factual bases for potential claims against Defendants before drafting and filing the initial complaint, which involved identifying and interviewing former employees that were familiar with the Company and others with potentially relevant knowledge, and additional extensive investigation after the appointments of lead plaintiff to amend the complaints, which included consulting with experts and hiring an investigator to interview witnesses on multiple continents; (ii) opposing Defendants' letter request to have this Action and the *White* Action deemed related under Rule 50.3.1(d) of the Guidelines for the Division of Business Among Judges; (iii) drafting and filing lengthy and comprehensive amended complaints; (iv) researching and drafting an opposition brief in response to Defendants' motion to dismiss in the *In re Nano-X* Action; (v) researching and drafting an opposition brief in response to Defendants' motion to consolidate; and (vi) preparing and filing responses to Defendants' pre-motion letters with respect to motions to dismiss and/or stay.  Moreover, at each step of the way, Co-Lead Plaintiffs and their counsel were opposed by Defendants' sophisticated and well-versed counsel at Skadden, Arps, Slate Meagher & Flom LLP.

29

97. Further, the complexity of the issues magnified these risks. Defendants would have continued to argue that even if Plaintiff could establish a material misstatement or omission, there was no evidence upon which the requisite mental state of scienter—*i.e.*, that Defendants misled investors knowingly or recklessly—could be proven. The scienter requirement is commonly regarded to be the most difficult element of a securities fraud claim. Here, Defendants were adamant that they had no intent to deceive.

98. Another considerable risk is whether Plaintiffs could ultimately prove that the Class was damaged by the alleged misrepresentations and the amount of those damages. At trial, this would come down to "battle of experts." The outcome of such battles is never predictable, and there existed the very real possibility that a jury could be swayed by experts for Defendants used to minimize the Settlement Class's losses or to show that the losses were attributable to factors other than the alleged misstatements and omissions. Thus, even if Plaintiff prevailed as to liability at trial, the judgment obtained could have been only a fraction of the damages claimed.

99. This case also involved highly technical underlying subject matter requiring proof from abroad, in addition to the complex issues of proof usually attendant to securities fraud litigation. Plaintiffs faced the risk they would be unable to secure any evidence, or sufficient evidence, to adequately prove their claims. Moreover, even if Plaintiffs proceeded to trial and achieved an award higher than the Settlement, there was a substantial risk that victory would be illusory and the award uncollectible. In assessing the Settlement, Plaintiff and Co-Lead Counsel considered Nano-X's status as a development-stage company with limited products and cash flow.

100. Additionally, the mediation and settlement process in this Action was hard-fought. The parties zealously advocated their positions throughout, and engaged in robust arm's-length negotiations between highly experienced counsel.

### 3. The Significant Risks Borne By Co-Lead Counsel

101. This prosecution was undertaken by Co-Lead Counsel on an entirely contingent-fee basis. From the outset, there was no guarantee that Co-Lead Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Co-Lead Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a litigation like this one was covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Co-Lead Counsel received no compensation for this case during the course of the Action and collectively incurred $91,076.19 in litigation-related expenses.

102. Co-Lead Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this Litigation presented multiple risks and uncertainties that could have prevented any recovery whatsoever.

103. Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Co-Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

### 4. The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of Co-Lead Counsel, And The Standing And Caliber Of Defendants' Counsel

104. As demonstrated by the firm resumes of Pomerantz and Levi & Korsinsky, Co-Lead Counsel are highly experienced and skilled law firms that focus their practices on securities

31

class action litigation. Indeed, Co-Lead Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. *See id.* Co-Lead Counsel enjoy a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters.

105. Additionally, the quality of the work performed by Co-Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Defendants were represented by Skadden, Arps, Slate Meagher & Flom LLP, a well-known international law firm that vigorously represented the interests of its clients throughout the Action. In the face of this experienced and formidable opposition, Plaintiffs' Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that we believe are highly favorable to the Settlement Class.

### 5.    The Requested Fee In Relation to the Settlement

106. The amount of the fee requested (33%) in relation to the Settlement Amount ($8 million) is fair and reasonable. Courts routinely award fees of one-third in securities class action settlements. *See* Fee Brief Part III.B.4.

### 6.    Interests Of Public Policy, Including The Need To Ensure The Availability Of Experienced Counsel In High-Risk Contingent Securities Cases

107. Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel in

consideration of the risks undertaken in prosecuting a particular securities class action.  Relatedly, it is a long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

### 7. The Reaction Of The Settlement Class Supports Co-Lead Counsel's Fee Request

108. As noted above, as of January 10, 2024, 41,872 copies of the Notice have been disseminated advising Settlement Class Members that Co-Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33% of the Settlement Fund.  Blow Decl. ¶ 8, Ex. A (Notice) at p. 2.  In addition, the Summary Notice was transmitted over the *PR Newswire*.  *Id*. at ¶ 9; Ex. B (confirmation of Summary Notice publications).  To date, no objections to the maximum potential attorneys' fees request set forth in the Notice have been received or entered on this Court's docket.  Any objections received after the date of this filing will be addressed in Co-Lead Counsel's reply papers, set to be filed by February 8, 2024.

### 8. Co-Lead Plaintiffs Support Their Counsel's Fee Request

109. As set forth in the declaration attached hereto, Davian Holdings has concluded that Co-Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Declaration of David J. Ross ¶ 6, attached hereto as Exhibit 3 (the "Ross Declaration").  Plaintiffs have been involved throughout this lengthy litigation and the Settlement of the Action, and their endorsement of Co-Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

110. In sum, Co-Lead Counsel accepted the Action on a fully contingent basis, committed significant resources, and prosecuted the Action without any compensation or

guarantee of success.  Based on the result obtained, the quality of the work performed, the litigation risks, and the contingent nature of the representation, Co-Lead Counsel respectfully submit that a fee award of 33% of the Settlement Fund, resulting in a multiplier of 2.44, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.  Payment Of The Requested Litigation Expenses Would Be Fair And Reasonable

111.    Co-Lead Counsel collectively seek a total $91,076.19 in litigation expenses reasonably and necessarily incurred by Co-Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.

112.    From the commencement of this Action, Co-Lead Counsel understood that they might not recover their litigation expenses.  Co-Lead Counsel also understood that, even assuming the case was ultimately successful, payment of their expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute the Action.  Accordingly, Co-Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.  A description of the expenses incurred by Co-Lead Counsel by category is included in the individual firm declarations submitted on behalf of Pomerantz and Levi & Korsinsky.

113.    As set forth in the Fee and Expense Schedules, Co-Lead Counsel's Litigation Expenses total $91,076.19.  These expenses are detailed in Co-Lead Counsel's declarations, which identify the specific category of expense—*e.g.*, expert and consultant fees, mediation fees, travel costs, online/computer research, and photocopying.  As attested to, these expenses are reflected on the books and records maintained by each firm.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of counsel's expenses.

114.    To date, no objection has been raised as to expenses.  If any objection to the request for Litigation Expenses is made after the date of this filing, Co-Lead Counsel will address it in their reply papers.

115.    All of the Litigation Expenses, which total $ $91,076.19, were necessary to the successful prosecution and resolution of the claims against Defendants.

116.    Moreover, Co-Lead Counsel's work will not end with the filing of the instant Motions or the Court's approval of the Settlement. Co-Lead Counsel will necessarily spend more time and resources drafting and filing the replies in support of its Motions, preparing for and appearing at the Final Approval Hearing, overseeing the claims process and distribution of the Settlement Fund to Settlement Class Members, and responding to Settlement Class Members' inquiries. Co-Lead Counsel will seek no additional compensation for this work.

C.    **PSLRA Awards For Co-Lead Plaintiffs**

117.    Finally, as stated above, Co-Lead Plaintiffs respectfully request PSLRA awards in the amount of $3,000 each, or $9,000 total, pursuant to 15 U.S.C. § 78u-4(a)(4), for the reasonable costs directly incurred, including the time and effort expended by Plaintiffs in connection with representing the Settlement Class.  Co-Lead Counsel respectfully submit that the amounts requested by Co-Lead Plaintiffs are consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional investors to take an active role in commencing and supervising private securities litigation.

118.    As set forth in the declaration of David J. Ross on behalf of Lead Plaintiff, Davian Holdings Limited has been engaged in this action for more than three years.  Its senior director has participated in discussions concerning the prosecution of the Action, the strengths and risks of the asserted claims, and potential settlement.  In particular, throughout the course of the Action, representatives of Lead Plaintiff Davian Holdings: (a) reviewed all of the pleadings and briefing

35

filed in the Action; (b) regularly consulted with Co-Lead Counsel regarding the progress of and strategy for the case; (c) compiled its trading data and completed its certification in connection with its motion to be appointed Co-Lead Plaintiff; (d) conferred with Co-Lead Counsel regarding the mediations and settlement negotiations; (e) and evaluated and approved the proposed Settlement with Defendants and the plan of allocation.

119.    Throughout active participation during the litigation, Lead Plaintiff Davian Holdings was kept informed about prosecution of the Action, the potential impact of *White v. Nano-X Imaging Ltd.*, the strengths and risks of the claims, and the progress of settlement negotiations. *See* Ross Decl. ¶ 4. As a sophisticated investor, these efforts provided a significant benefit to the Settlement Class given the substantial financial interest in this case, Lead Plaintiff had every incentive to, and did, negotiate a fair and reasonable fee at the outset of its involvement. *Id.* at ¶¶ 2, 5

120.    These litigation efforts required representatives of Plaintiffs to dedicate time and resources to both Actions that they would have otherwise devoted to their regular duties. *Id.* Accordingly, Lead Plaintiff Davian Holdings respectfully requests an award of $3,000 to reimburse them for the time they devoted to representing the interests of absent Settlement Class Members in connection with this Litigation.

121.    To date, no objections to the Litigation Expenses or compensatory awards for Co-Lead Plaintiffs have been received.  In Co-Lead Counsel's opinion, the Litigation Expenses incurred by Co-Lead Counsel and Co-Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Co-Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.   CONCLUSION

122.   In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, Co-Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable.  Co-Lead Counsel further submit that the requested fee in the amount of 33% of the Settlement Fund ($2,666,666.67), plus interest at the same rate and for the same period as earned by the Settlement Fund, should be approved as fair and reasonable, the request for payment of $91,076.19 in Litigation Expenses, and Co-Lead Plaintiffs' requests for awards of $3,000 each (totaling $9,000) for the time and resources they dedicated to diligently representing the Settlement Class, pursuant to the PSLRA, should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 11th day of January 2024, at New York, New York.

_Justin D. DAloia_
JUSTIN D'ALOIA

37